# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | | |
|---|---|---|
| LARRY CHAVIS, | ) | Civil Action No. 1:24-cv-00805 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNIVERSITY OF NORTH | ) | |
| CAROLINA-CHAPEL HILL and the | ) | |
| BOARD of GOVERNORS of the | ) | |
| UNIVERSITY of NORTH CAROLINA, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff **Larry Chavis** ("Plaintiff" or "Chavis"), by and through his undersigned attorneys, HKM Employment Attorneys LLP, brings this civil rights action for relief and damages against Defendants **University of North Carolina-Chapel Hill** and the **Board of Governors of the University of North Carolina**, ("Defendants" or "UNC") based on the following factual allegations and causes of action.

## PRELIMINARY STATEMENT

1.     Plaintiff Chavis brings this action under 42 U.S.C.A.§ 1983 to correct unlawful and unconstitutional employment practices by Defendant UNC in violation of 42 U.S.C. § 1981 and the First Amendment of the United States Constitution. Chavis, an 18-year member of the faculty at UNC's Kenan-Flagler Business School, contends his termination at the end of the 2023-24 academic year was retaliation for his public criticisms of UNC's recording of his classroom lectures in contravention of its own policies and for his comments in various media forums regarding discriminatory practices at the business school.

2.     Chavis also alleges that his termination reflects retaliation based on his long-standing history of challenging UNC's lack of faculty diversity and its prior discriminatory conduct toward him, including pay disparities between Chavis and faculty members of other races.

3.     Chavis seeks economic damages, including back pay and front pay, as well as lost benefits; noneconomic compensatory damages; and attorneys' fees and costs of litigation.

///

///

## PARTIES

4.     Chavis, who is of Native American origin, is a citizen of the United States and the State of North Carolina and was at all times relevant to this complaint employed by UNC.

5.     UNC-Chapel Hill is a public university that is the flagship of the University of North Carolina system and is located in the Middle District of North Carolina.

6.     UNC-Chapel Hill operates under the authority of the Board of Governors of the University of North Carolina system, and both entities are subject to being sued.

## JURISDICTION

7.     The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331 (federal question).

## VENUE

8.     Pursuant to 28 U.S.C. § 1391(b)(1), the Middle District of North Carolina is the proper venue for the filing and prosecution of this action in that Defendants in this case have a principal place of business in the Middle District of North Carolina and because the employment practices and other conduct alleged to be unlawful occurred in this district.

**FACTUAL ALLEGATIONS**

**Chavis' background at UNC**

9.      From 2006 until his termination in June 2024, Chavis, who earned his Ph.D. from the Stanford Graduate School of Management, taught in the Kenan-Flagler Business School. Initially, he was on a tenure track, but in 2013, Chavis decided to transition to a permanent nontenure-track position as an assistant professor of strategy and entrepreneurship.

10.     As a nontenure-track faculty member, Chavis was employed on a contractual basis subject to periodic renewal at the sole discretionary authority of the Dean of the Kenan-Flagler Business School, without provision for appeal or review of a non-renewal decision.

11.     Beginning around 2015, Chavis pursued several opportunities for senior-level administrative roles, and at one point he emerged as the front-runner for the position of associate dean of the undergraduate business program at UNC.

12.     But after several opportunities, including the undergraduate associate dean slot, failed to materialize, Chavis, who is a member of the Lumbee Tribe of North Carolina, was encouraged by Doug Shackelford, the dean of the business school, to accept an interim appointment in 2017 as head of UNC's American Indian Center ("AIC').

13.     Shackelford also advised Chavis that he was no longer viewed as a viable candidate for an associate dean's role because he was seen as too opinionated.

14.     In 2018, Chavis was named the full-fledged director of the AIC.

15.     Chavis continued to have ambitions for an academic leadership role, but he was continually steered toward roles related to his ethnicity. For example, in 2021, Shackelford encouraged Chavis to apply for the job of dean of the business school at UNC-Pembroke, a college that maintains close ties to the Lumbee Tribe.

**Chavis' emergence as an advocate of diversity and inclusion at UNC**

16.     In 2020, Chavis started to become more vocal about racial equity issues at Kenan-Flagler. In a forum that year between the faculty council and the chancellor of the UNC system, Chavis openly criticized the anemic funding for the AIC. Chavis' remarks received coverage on CNN and in the campus newspaper, the *Daily Tar Heel*.

17.     In September 2020, Chavis emailed then-Chancellor of the UNC system Kevin Guskiewicz a letter of complaint regarding his treatment at Kenan-Flagler. He alleged that Kenan-Flagler had marginalized him based on his Native American heritage while openly sanctioning racially insensitive practices, including conduct by a white professor who "would pull out maracas and a sombrero and sing 'La Cucaracha' when he talked about trade with Mexico."

18. In his letter to Guskiewicz, Chavis also described being rejected for openings for associate dean roles at Kenan-Flagler and on the undergraduate campus in favor of "white guys who are less qualified."

19. Guskiewicz ordered an investigation by UNC's Equal Opportunity and Compliance ("EOC") Office that expanded into a more comprehensive institutional climate assessment. While the EOC published findings in August 2021 that recommended a more-intensive focus on expanding recruitment of racial minorities, it issued no conclusions regarding Chavis' specific complaints that he was denied advancement for racially discriminatory reasons.

20. In 2021, Chavis voluntarily resigned the directorship of the AIC to protest the consistent underfunding of the center. In communications with UNC leaders, he communicated his belief that the center had been relegated to a token of inclusion.

21. Despite Chavis' frustrations at Kenan-Flagler, his star in the academic world outside the UNC system continued to rise. In 2021, he was named a fellow at the American Council on Education ("ACE"), one of the most prestigious platforms in the country for training high-ranking academic officers. No other member of the Kenan-Flagler faculty has been named an ACE fellow.

22. But when Chavis applied in early 2022 for the position of assistant dean of the undergraduate Business Department, Shimul Melwant, the associate

dean of the program, admonished Chavis that he was unacceptable because his views were too controversial.

23.     In 2022, Chavis told the *Daily Tar Heel* that Kenan-Flagler was the "worst of the worst" regarding faculty diversity among the nation's top-ranked business schools.

24.     When Shackelford resigned as dean in the summer of 2022, Chavis wrote an opinion column in the *Daily Tar Heel* criticizing the business school for passing over the chance to recruit a particularly accomplished Black female candidate for the position who had been rumored to have an interest in the job.

25.     As Chavis developed a more outspoken profile, his compensation began to stall. By 2023, his salary ranked in the bottom 10 of the 27 assistant professors, despite his having more longevity than the 17 faculty members with salaries higher than his. The length of service of the group of more highly compensated non-tenured professors ranged from one year to nine years, in contrast with Chavis' start in 2006.

26.     At the beginning of the spring 2023 academic semester, Chavis informed students in his international development class that he would not permit students to wear insignia on their clothing regarding sports teams like the MLB Atlanta Braves and the NFL Kansas City Chiefs, which he criticized for

expropriating Native American imagery and invoking warrior-like stereotypes of Indigenous culture.

27.     Chavis was verbally admonished about his comments by Senior Associate Deans Christian Lundblad and Bradley Staats, who warned that Chavis' actions could generate political backlash and attract scrutiny from what an administrator referred to as the "conservative legislature."

28.     During 2022, Chavis was promoted from associate clinical professor to full clinical professor, which meant that he had compiled excellent-level rankings in two of the three categories of teaching, service, and impact activities.

29.     Despite the promotion, in June 2023 Chavis was abruptly informed that his teaching contract, which normally ran in two-year cycles, would be shortened to one year for the 2023-24 academic year.

30.     According to "best practices" guidelines prepared for UNC's Office of Faculty Governance, a nontenured professor of Chavis' longevity with the rank of full professor merited a minimum five-year contract.

**The 2023-24 academic year**

31.     In February 2024, Chavis met with the new dean at Kenan-Flagler, Mary Margaret Frank, as part of a series of conversations Frank held with faculty members about the state of the business school.

32.     In the course of their meeting, Chavis openly discussed his views that he had been marginalized because of his advocacy of diversity-and-inclusion based efforts. Chavis related to Dean Frank that he feared his career at UNC had plateaued because of his opinions.

33.     Chavis also told Dean Frank that he believed his outspokenness contributed to the salary disparity between him and considerably less-experienced nontenured assistant professors and to the decision to reduce his employment contract to one year.

34.     Within days of the conversation, Chavis sent an email to Frank expanding on their conversation and adding additional details of ostracism. Chavis mentioned that multiple colleagues had warned him that he had become deeply unpopular with the leaders of the business school and that he had made himself a target because of the growing backlash against champions of diversity and inclusion initiatives.

35.     Frank ignored the correspondence, and when Chavis followed up to say that he was distressed by the lack of any response, Frank sent a terse reply and did not invite more substantive follow-up.

36.     In early April 2024, Chavis shared the email thread with students in his international development course in an effort to provoke discussion about best strategies for promoting inclusion.

37.    On April 22, 2024, Chavis was notified in an email from Senior Associate Dean Lundblad that he was the subject of an internal academic conduct review based on "reports concerning class content and conduct within [Chavis'] class over the last few months."

38.    Lundblad informed Chavis in the letter that four of his April 2024 classes had been recorded by an internal camera system installed in each classroom.

39.    According to Lundblad's message, "Notice is not required to record classes, and we do record classes without notice in response to concerns raised by students."

40.    Despite Lundblad's representation, Kenan-Flagler's public website on IT policies expressly states that "recordings are to be accessed and used only as directed by the faculty member teaching the course." Furthermore, "[i]ndividual classes are only recorded with the "express permission of faculty." At no point did Chavis consent to recordings of his classes.

41.    The recording of Chavis' class may also have run afoul of North Carolina law that requires that at least one party to a recording provide consent. In addition to Chavis failing to provide consent, there is no evidence that any student consented or would have had legal authority to do so on behalf of other students.

42.    Chavis made it clear to Lundblad in an email response that he believed he was being "unfairly targeted" because of his national origin and his prior

criticisms of Kenan-Flagler, including the 2021 EOC complaint. As Chavis stated in his message to Lundblad, "It appears to me that Kenan-Flagler ... broke publicly posted rules to target and intimidate me."

43.     In the wake of the disclosure, Chavis gave interviews to multiple media outlets criticizing the recording of his classes without permission and raising the prospect that the recordings encroached on students' expression of personal views. In each instance, Chavis recounted Kenan-Flagler's lack of faculty diversity. The entities to which Chavis gave published interviews included *The Assembly, Daily Tar Heel*, the blog *Poets and Quants*, and *Inside Higher Ed*. Chavis also provided email correspondence to *The Assembly* regarding the 2021 EOC institutional assessment regarding the racial climate at Kenan-Flagler.

44.     Chavis also provided broadcast interviews regarding the recordings to local media affiliates for NBC and ABC. In the ABC station interview, Chavis criticized the business school for violating its internal policies regarding recording, and for creating a climate that at times marginalized him as a professor of Native American ancestry. Chavis suggested in the ABC broadcast that he had been targeted because he was a Native American who espoused controversial views.

45.     In the NBC affiliate interview, Chavis criticized the recordings as an intrusion on the privacy rights of students.

46.     Chavis continued his commentary about the recordings on the career forum LinkedIn, where he made multiple posts in late April 2024 listing the letter from Lundblad and the email exchanges with Dean Frank. Chavis openly speculated in one post that the recordings, which occurred within days of the end of the correspondence with Frank, were motivated by his sharing his correspondence with Frank with his class.

47.     Chavis, in another LinkedIn post in late April 2024, discussed the gap between his pay and that of other faculty at the business school. He observed that the salary gap started to widen as "I told the truth a little too often and too publicly. Then I woke up to realize that whoever sets my salary thinks I am half as valuable as my peers."

48.     Although Chavis' interviews reflected in some measure dissatisfaction with his own treatment, his expression plainly involved matters of political and social concern or interest, including the extent to which a public university acted in a discriminatory manner and whether its recording of class discussions ran afoul of the privacy rights of students.

49.     Chavis was never formally interviewed as part of the academic conduct review, nor was he ever disciplined for inappropriate course content.

50.     In May 2024, Chavis received an end-of-year faculty evaluation that provided an overall positive rating but cited Chavis for shifting the course content

of his international development course to focus disproportionately on issues of Indigenous culture and marginalization.

51.    Chavis responded to the evaluation by providing emails that made it clear that the alterations to Chavis' curriculum and the most recent version of his syllabus had been approved by his department.

52.    The attachments to the faculty review also contained the end-of-semester written student evaluations, in which 87% of the respondents agreed or strongly agreed that the course "covered material that is relevant to the business world," while a single student strongly disagreed.

53.    Ninety-one percent of students agreed or strongly agreed that Chavis "created a learning environment that made students feel included and valued." Out of 35 students, two disagreed.

54.    Among the end-of-semester evaluations were comments that Chavis' course offering created a "magical atmosphere," provided "a much needed change of pace," "it truly made me challenge some of the ideologies that I didn't realize were false or harmful," and that the course "was one of the most informative courses I have taken at Carolina."

55.    On June 10, 2024, Chavis was notified in an emailed letter from Dean Frank that his employment contract would not be renewed. Chavis was provided no explanation.

56.    Just four months earlier, Associate Dean Lundblad had assured Chavis that his contract would be renewed and that, in future years, his contract would be returned to multiyear status.

57.    A month prior to parting ways with one of its most fervent advocates of racial equity, UNC's Board of Governors voted to formally repeal the university's diversity, equity, and inclusion ("DEI") policy and to eliminate the full-time position of senior-level DEI officer.

58.    The reversal of the plan to renew Chavis' contract came after months of overt public criticism of Kenan-Flagler in print, broadcast, and social media. The substance of Chavis' comments about UNC's business school in the spring of 2024 also reflected opposition to various racially discriminatory practices.

59.    The timing of Chavis' firing creates a clear inference that the exercise of his First Amendment speech rights and his denunciation of discriminatory conduct caused UNC to end Chavis' 18-year career at the business school.

60.    UNC's conduct has dealt a substantial blow to Chavis' career and his future. In addition to the immediate loss of income, the likelihood is that Chavis' career will be confined to lower-tier academic institutions that lack UNC's prestige, which will diminish his future earning potential.

61.    Furthermore, Chavis' termination has caused him significant emotional distress, mental anguish, embarrassment, and public humiliation.

**CAUSES OF ACTION**

**COUNT I**

**(First Amendment Retaliation, in violation of 42 U.S.C.A. § 1983)**

62.    Plaintiff realleges and incorporates the factual allegations above as though fully set forth herein.

63.    Plaintiff's public criticisms in print, broadcast, and social media of various institutional practices at UNC's Kenan-Flagler Business School—including discussion of the unauthorized recording of academic classes, the invasion of student privacy, and patterns of racially discriminatory conduct—all implicated matters of legitimate public concern.

64.    Plaintiff's exercise of his free speech rights was a substantial factor in his termination as an assistant professor.

65.    Defendant's unconstitutional conduct was effected by the dean of UNC's Kenan-Flagler business school, who possesses final policymaking authority with respect to the employment of nontenured faculty personnel.

66.    As a direct and proximate result of Defendant's unconstitutional conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and suffering; and embarrassment and humiliation. Plaintiff is also entitled to recover attorney's fees and costs as permitted by law.

## COUNT II

## (Retaliation in violation of 42 U.S.C. §§ 1981 and 1983)

67.     Plaintiff realleges and incorporates the factual allegations above as though fully set forth herein.

68.     Plaintiff asserts his retaliation claims through § 1983, which operates as the exclusive source of federal remedies for violations by state actors of the rights guaranteed in § 1981.

69.     Plaintiff repeatedly engaged in protected activity under § 1981 by making internal and public complaints of racially discriminatory conduct at the Kenan-Flagler Business School, including but not limited to hiring practices, his inequitable compensation in comparison to peers not of his race or national origin, and alleged racial targeting.

70.     Defendant retaliated against Plaintiff for conduct oppositional to race and national origin discrimination by terminating his employment.

71.     Defendant's retaliatory conduct was effected by the dean of UNC's Kenan-Flagler Business School, who possesses final policymaking authority with respect to the employment of nontenured faculty personnel.

72.     As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered economic damages, including lost wages and benefits; compensatory damages, including emotional pain and suffering; and embarrassment

and humiliation. Plaintiff is also entitled to recover attorney's fees and costs as permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendants and order the following relief as allowed by law:

1. Permanently enjoining Defendants from engaging in said unlawful practices, policies, customs, and usages set forth herein and from continuing any and all other practices shown to be in violation of applicable law.

2. The award to Plaintiff of economic and compensatory damages as described herein.

3. The award to Plaintiff of attorney's fees and costs of this action.

4. The award to Plaintiff of prejudgment and post-judgment interest at the highest rate.

5. The award to Plaintiff of such other equitable relief as the Court may deem justified.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully submitted this 26th day of September 2024.

**HKM Employment Attorneys LLP**

*s/Sunny Panyanouvong-Rubeck*
P. Sunny Panyanouvong-Rubeck

N.C. Bar No. 39966
3623 Latrobe Drive
Unit 122
Charlotte, NC 28211
980-300-6630
980-734-3851 (fax)
spanyanouvong-rubeck@hkm.com

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis[1]

(admitted in Alabama)
ASB-3672-D56A
2024 3rd Ave. North
Suite 212
Birmingham, AL 35203
205-881-0935
adavis@hkm.com

---

[1] Mr. Davis is licensed in the State of Alabama and will promptly file a notice of special appearance in this cause of action.