IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE OF NORTH CAROLINA
DURHAM DIVISION
Case No. 1:24-CV-00805-CCE-JLW

_____

                                    )
LARRY CHAVIS,                       )
                                    )
              Plaintiff,            )
                                    )
V.                                  )
                                    )
THE UNIVERSITY OF NORTH             )
CAROLINA-CHAPEL HILL and MARY       )
MARGARET FRANK, in her              )
Individual Capacity,                )
                                    )
              Defendants.           )
                                    )
_____

         Deposition of SHIMUL MELWANI
_____

   Held at the Office of University Counsel

 The University of North Carolina-Chapel Hill

        Chapel Hill, North Carolina

_____

         Wednesday, January 7, 2026
                12:15 P.M.

_____

              Volume 1

        Pages 1 through 175

EXHIBIT Q

A P P E A R A N C E S

For the Plaintiff Chavis:

Artur Davis, Esquire
HKM Employment Attorneys LLC
2024 3rd Avenue North, Suite 212
Birmingham, Alabama  35203
(205) 203-9924
adavis@hkm.com


Sunny Panyanouvong-Rubeck, Esquire
HKM Employment Attorneys LLC
3623 Latrobe Drive, Unit 122
Charlotte, North Carolina  28211
(980) 300-6630
spanyanouvong-rubeck@hkm.com


For the Defendants The University of North
Carolina-Chapel Hill, et al:

Jeremy Lindsley
Assistant Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina  27602
(919) 716-6851
jlindsley@ncdoj.gov


Zachary A. Padget

Litigation Counsel

The University of North Carolina at Chapel Hill

123 West Franklin Street, Suite 600A

Chapel Hill, North Carolina  27599

(919) 843-8245

padget@unc.edu

Case 1:24-cv-00805-CCE-JGM    Document 49-17    Filed 03/16/26    Page 2 of 14

T A B L E   O F   C O N T E N T S

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| Shimul Melwani | | | | |
| by Mr. Davis: | 5-171 | | 174 | |
| by Mr. Lindsley: | | 171-174 | | |

E X H I B I T S

| Number | Description | Marked |
|--------|-------------|--------|
| 1 | Emails | 37 |
| 2 | Emails | 45 |
| 3 | Case Information | 87 |
| 4 | Emails | 108 |
| 5 | Email | 115 |
| 6 | Email | 122 |
| 7 | Emails | 130 |
| 8 | Email | 131 |
| 9 | Advocate Report | 136 |

S T I P U L A T I O N S

Prior to the examination of the witness counsel for the parties stipulated and agreed as follows:

1. This deposition shall be taken pursuant to the Federal Rules of Civil Procedure.

P R O C E E D I N G S     12:15 P.M.

(Whereupon,

Shimul Melwani

was called as a witness, duly affirmed, and testified

as follows:)

D I R E C T   E X A M I N A T I O N   12:15 P.M.

By Mr. Davis:

Q    All right, Dr. Melwani, we obviously have met before, but let me get you to formally introduce yourself on the record.

A    Sure, my name is Shimul Melwani.  I'm a faculty member at UNC Chapel Hill at Kenan-Flagler Business School.  I'm a professor of organizational behavior, and I also serve as the associate dean of the undergraduate business program.

Q    And I'll introduce myself again, formally on the record.  My name is Artur Davis, and I am a lawyer at HKM Employment Attorneys.  My colleague, Sunny Panyanouvong-Rubeck, is getting some copies made, as I told you before we started, but she'll be joining us any minute now.  We represent Dr. Larry Chavis, who has filed a lawsuit against the University of North Carolina Chapel Hill, and he's also included in that lawsuit the Dean of the Kenan-Flagler Business School, Mary Margaret Frank.  You're aware that lawsuit has

Case 1:24-cv-00805-CCE-JGM    Document 49-17    Filed 03/16/26    Page 5 of 14

Q    Okay, that's what I thought.

A    -- who were a month away from graduation at the time.

Q    Okay, all right.

A    A month or two.

Q    And ███████████████ asked if they could stay behind to have a conversation with you and Dr. Hale, is that right?

A    That's right.

Q    Tell me your best recollection of what ███████ ███████ said to you?

A    So we talked with them for quite a long time. They started out by telling us that they had taken Dr. Chavis's class in Spring of '23, so it was a year after.  And they said that they --

Q    And this was his International Development course?

A    Yes.

Q    Okay.

A    This was the same course, and it was the time -- and so they -- they basically came to us and they said, we want to speak to you.  You have talked to us about different courses, and we've talked about -- you know, we've given you feedback on a bunch of other ones, but we want to speak to you about this class in

Case 1:24-cv-00805-CCE-JGM    Document 49-17    Filed 03/16/26    Page 6 of 14

particular. And we have been really anxious and worried about the students who are in the class right now, and we have not spoken up about this because we've been afraid of retaliation and -- and humiliation. And so they -- but they were like, we're leaving and if we -- we'd like to talk to you about a course, and if you're willing to keep it confidential and not have our names go out, then we would like to talk to you about it. And we said we would, and they said they were really concerned about their experience. And I guess if I had to talk about the three big issues they labeled, the first one was that the class was not advertised appropriately on the catalog. So one of them in particular is still doing work and in the development space. So essentially, he was like, I took the course because this is what I want to do.

Q    And which one is that?

A    ███████

Q    ███████

A    Yeah.

Q    Okay.

A    And he said that he -- and so his friend took the class with him. And they said that they didn't have a syllabus for the first four weeks of the class, and so they didn't -- so one, they took the class

Case 1:24-cv-00805-CCE-JGM    Document 49-17    Filed 03/16/26    Page 7 of 14

believing it was about international development more holistically, and then once they received the syllabus, the add/drop period had ended for the -- for the course, and so as a result of that -- add/drop period is like where you can drop a class without it being penalized on your transcript, so it doesn't look like you've dropped a class because you were doing badly in it. And so they said the period had ended and so they were sort of like stuck remaining in the class. So that was the first thing they talked about, sort of the fact that Professor Chavis hadn't shown up to the first couple of classes. The learning management page had not been set up, so a whole series of sort of organization-focused issues. They also highlighted that even though there were readings that were assigned per week as per the syllabus, it was never really followed. And they talked about how the class essentially was a stream of consciousness conversation where there was a lot shared about Professor Chavis's personal issues with people at Kenan-Flagler, other things that were happening outside of work, and that they were like -- and then being forced to kind of respond to these issues as well, because as you can see from the syllabus, the class participation percent is quite high, 35 percent, I believe. And so they felt

compelled to sort of raise their hands and answer these questions that were irrelevant to International Development and made them feel really uncomfortable to have opinions on.  And then the third thing they talked about was the fact that there were different individuals in the class that they felt were being, for different reasons, sort of honed in on.  So, you know, there was the sort of complaint like, so if you were a White male student in a fraternity wearing Greek letter T-shirt, that there would be something that Professor Chavis would sort of draw attention to that, say something humiliating.  They said it was really uncomfortable to speak up and with any differential -- different perspectives on things.  They talked about the fact that a Black student from -- who was part of one of the large Black fraternities here was asked to sort of like share some chants or something that was connected to his fraternity, and was really uncomfortable, but was kind of forced or compelled by Dr. Chavis to do that.  So they shared a number of those things with us and, you know, it was very concerning, and that was -- so we kind of took their -- like we'll listen to what they had to say, and that was the end of the conversation at that point.

Q    Did you ask either of them if they had any

Case 1:24-cv-00805-CCE-JGM    Document 49-17    Filed 03/16/26    Page 9 of 14

that they feel unsafe because of their identity, as a responsible employee, I have to say something about it, whether in some cases -- whether I don't even -- I have zero evidence or any knowledge of the students, but it's just something that I'm supposed to do, so I immediately go and do it. And knowing that this is, as someone who makes many of these for different reasons in a -- in a year, you know, I -- like sometimes it's student on student. Sometimes it's staff, faculty. You just have to write a short overview so that then they can go through the actual interview and investigation process.

Q   Now today, Dr. Melwani, when I asked you to relate what ████████████████, and I'm going to call him ██████ because I can't read my own handwriting --

A   It's okay.

Q   -- and don't want to keep remembering his last name, so I will also call him ████. When you talked to me today about what ████████████████ said, you did not make any reference to a quote that you have in this document about, quote, --

A   Yeah.

Q   -- burning this bitch down. But that's listed in this document, isn't it?

A   It is, yes, and I don't recall if they said

Case 1:24-cv-00805-CCE-JGM   Document 49-17   Filed 03/16/26   Page 10 of 14

it to me or not. It's very possible that they did and I just -- it was a lot of information in a lot of time, and it was very activating information. So it's, you know -- this was me in the day I received the information. This is me two and a half years from now. So the specifics of exact -- the exact conversation, it's unclear whether I -- what they told -- whether they exactly said those words to me in the meeting or not.

Q    Do you believe that the source of that comment by Dr. Chavis was ███████████████ ?

A    Are you asking me which one of them said it?

Q    Or either one of them; are you able to say to me today that's where you got that?

A    It's possible, but I don't recall exactly.

Q    Who else would you have gotten that information from?

A    It was also in a teaching evaluation.

Q    Had you had a chance to review teaching evaluations by the time you prepared this mandatory report?

A    I definitely had, because I attached the teaching evaluation.

Q    But had you had -- attaching is one thing. Reading is another. Do you believe you had taken time

these allegations with Dr. Chavis?

A No, and as I also shared before, when these types of situations arise, it's sort of something that gets translated up to the leadership of the school to manage. So I typically don't get involved with sort of those conversations at that point.

Q Did Lundblad or Staats instruct you not to discuss these allegations with Chavis?

A No.

Q While it's relegated to one clause of your paragraph, there is a reference to Chavis teaching curricular content he was not authorized to teach. When you received that information, let me ask you, was the conversation with ███████████ the first time you suspected that Larry Chavis was teaching unauthorized content?

A Not -- I would say, yes, it was the first time and I would say at that point, it wasn't suspected; it was corroborated. So there is an expectation that faculty are following the syllabus that is in the catalog, and it's sort of an implicit assumption that that's what they do. So we are -- we're not auditing the -- you know, there's 100 courses ongoing. There's one of me, so we're not auditing every class, and so that was the first time I actually

Case 1:24-cv-00805-CCE-JGM    Document 49-17    Filed 03/16/26    Page 12 of 14

went and looked at what was being taught.

Q    What do you mean by it was corroborated that he wasn't teaching authorized content?

A    Well, I was able to go into his learning management system and pull the fact that the syllabus had a different title and had material that was not part of what the original approved syllabus had.

Q    So you did that in March of 2024?

A    I did that the same day that I spoke with ███████████████.

Q    Did you discuss with Dr. Chavis that there was a month of courses in front of him that, in your view, did not approve -- or did not align with approved content?

A    I did not.

Q    Did you make any effort on your own as the associate dean of this department to shape or to affect Dr. Chavis's teaching between March 2024 and April 2024?

A    I spoke with Dr. Lundblad about talking to him about it.  That's all I did.

Q    And what did Lundblad say?

A    That he will think about it.

Q    Did he ever tell you what his thoughts were?

A    Nope.

Case 1:24-cv-00805-CCE-JGM    Document 49-17    Filed 03/16/26    Page 13 of 14

NORTH CAROLINA

WAKE COUNTY

C E R T I F I C A T E

I, David L. Overby, Notary/Reporter, do hereby certify that Shimul Melwani was duly affirmed by Sydney D. Brown, Notary/Reporter, prior to the taking of the foregoing deposition; and that this deposition was taken by Sydney D. Brown and transcribed under my direction and that the one hundred seventy-five pages which constitute this deposition are a true and accurate transcript of the witness's testimony.

I certify that I am not counsel for, or employed by either party in this action, nor am I interested in the outcome of this action.

I further certify that the stipulations contained in this transcript were entered into by Counsel before the taking of this deposition.

IN WITNESS THEREOF, I have hereunto set my hand this 2nd day of March, 2026.

_David L. Overby_____

David L. Overby
Notary Public
Certificate No.: 19930120037