# In the Matter Of:

# CHAVIS V. UNIVERSITY OF NORTH CAROLINA

1:24-CV-00805-CCE-JLW

---

## LARRY CHAVIS

*December 03, 2025*

---

EXHIBIT A



800.211.DEPO (3376)
EsquireSolutions.com

NIN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LARRY CHAVIS,                    .        Civil Action No.:
                                 .        1:24-CV-00805-CCE-JLW
        Plaintiff,               .
                                 .        Chapel Hill, North
    vs.                          .        Carolina
                                 .
THE UNIVERSITY OF NORTH          .        Wednesday, December 3,
CAROLINA AT CHAPEL HILL AND .             2025
MARY MARGARET FRANK, IN HER .
INDIVIDUAL CAPACITY,             .        10:07 a.m.
                                 .
        Defendants.              .
. . . . . . . . . . . . .

VIDEOCONFERENCE DEPOSITION OF

LARRY CHAVIS

Taken by the Defendant the University of North Carolina

at Chapel Hill

ROCCO FRANCO, CER 202403900042
Esquire Deposition Solutions

Proceedings recorded by a reporter using electronic sound recording; transcript produced by the reporter and transcriber.



800.211.DEPO (3376)
EsquireSolutions.com

APPEARANCES OF COUNSEL

On behalf of LARRY CHAVIS:

    PHAVADY SUNNY PANYANOUVONG-RUBECK, ESQ.
    HKM EMPLOYMENT ATTORNEYS LLP
    3623 Latrobe Drive
    Suite 122
    Charlotte, North Carolina 28211
    980-300-6630
    spanyanouvong-rubeck@hkm.com

On behalf of THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL:

    ZACH PADGET, ESQ.
    OFFICE OF UNIVERSITY COUNSEL
    The University of North Carolina at Chapel Hill
    123 West Franklin Street
    Suite 600A
    Chapel Hill, North Carolina 27599
    919-962-1219
    padget@unc.edu

On behalf of THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL AND MARY MARGARET FRANK, IN HER INDIVIDUAL CAPACITY:

    JEREMY LINDSLEY, ESQ.
    NORTH CAROLINA DEPARTMENT OF JUSTICE
    114 West Edenton Street
    Raleigh, North Carolina 27603
    919-716-6400
    jeremyl@ncdoj.gov


    KENZIE RAKES, ESQ.
    MORNINGSTAR LAW GROUP
    434 Fayetteville Street
    Suite 2200
    Raleigh, North Carolina 27601
    919-829-4216
    krakes@morningstarlawgroup.com


Also present:

    Kristen Roehrig



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 3 of 79

INDEX TO EXAMINATION

EXAMINATION                                                    PAGE

Examination by Mr. Padget                                      7

Examination by Ms. Panyanouvong-Rubeck                        257

Examination by Mr. Padget                                     313

INDEX OF EXHIBITS

DEFENDANT'S      DESCRIPTION                                   PAGE

Exhibit 1        Invoices                                      13

Exhibit 2        CV                                            15

Exhibit 3        Manuscript Excerpt 1                          34

Exhibit 4        Contracts at UNC                              44

Exhibit 5        Manuscript Excerpt 2                          51

Exhibit 6        July 14, 2023 Faculty Mentorship             61

Exhibit 7        Tax Returns 2019-2024                         62

Exhibit 8        2020 Email to Kevin and Bob                   68

Exhibit 9        November 2020 Email with Brandon
                 Washington                                    91

Exhibit 10       Ted Zoller Letter 2022                        93

Exhibit 11       2024 Email with Brian Shamule               103

Exhibit 12       Course Evals Summer and Fall 2022           106

Exhibit 13       Manuscript Excerpt 3                         117

Exhibit 14       June 2023 Student Comments                  121

Exhibit 15       May 2023 Email From Son Ryan                153



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

INDEX OF EXHIBITS (CONT.)

| DEFENDANT'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 16 | May 25, 2023 Email | 162 |
| Exhibit 17 | Manuscript Excerpt 4 | 166 |
| Exhibit 18 | May 2023 Emails | 173 |
| Exhibit 19 | Email Regarding MBA Classes | 177 |
| Exhibit 20 | EOC Communication | 181 |
| Exhibit 21 | BUSI 611 Emails 2019 and 2022 | 192 |
| Exhibit 22 | Emails with Shimul Melwani 2023 | 200 |
| Exhibit 23 | Emails Dean Frank February and April | 210 |
| Exhibit 24 | Content Provided for Emails in Exhibit 23 | 211 |
| Exhibit 25 | BUSI 611 Syllabus Spring 2024 | 217 |
| Exhibit 26 | Emails Contract Renewal 2024 | 220 |
| Exhibit 27 | Manuscript Excerpt 5 | 222 |
| Exhibit 28 | Notice from Christian | 226 |
| Exhibit 29 | Response to Notice from Christian | 226 |
| Exhibit 30 | LinkedIn Post | 231 |
| Exhibit 31 | Teacher Eval and Response | 233 |
| Exhibit 32 | Burn This Bitch Down Post | 236 |
| Exhibit 33 | Jeffrey Gillman @ Assembly Communication | 243 |
| Exhibit 34 | Collection of Social Media Posts | 244 |



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 5 of 79

INDEX OF EXHIBITS (CONT.)

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | Elizabeth Hall Forwarded Email to EOC | 246 |
| Exhibit 36 | Notice of Investigation EOC August 8, 2024 | 247 |
| Exhibit 37 | Second Amended Complaint | 249 |

(Exhibits 1 through 37 were attached to the original transcript.)



800.211.DEPO (3376)
EsquireSolutions.com

were all focused on economics.

Q. Okay.

A. And I helped organize conferences. That was the main -- the main thrust of that position was organizing conferences. Bringing public policymakers, academics, business people together to brainstorm on various ideas.

Q. Okay. Was that a time-limited position or did you decide to leave in 2018?

A. That was also around the time that I started working at -- as the director of the American Indian Center, which was a much more all-encompassing position.

Q. Okay.

A. And so I -- I also think, if I remember correctly, they -- they changed things up in the -- the Kenan Institute and went in a different direction, as far as those -- those different initiatives. So it just, kind of, faded out, if I recall correctly. But there wasn't a -- and I can't remember if I said, hey, I'm -- I need to, like, focus on this or just -- yeah, it was -- but it was -- it hadn't necessarily been time limited, but it -- yeah, it -- it just ended.

Q. Fair enough. Different direction, you mentioned that, that you didn't agree with or just different direction --

A. Oh, no that --



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.    -- generally?

A.    It was not related to me or -- or a particular initiative.  It was just I think they felt that -- again, this is my best memory.  Felt that that way of organizing the Kenan Institute wasn't as effective as it could be.  And so they -- they organized differently.

Q.    Got you.  Okay.  So let's talk about, you mentioned it a couple times, your role as director of the UNC American Indian Center.  Again, tell me a little bit about the center.  And I know you list it here.

But, kind of, tell me, broad strokes, what your role was there?

A.    Sure.  I was -- I started as interim director in late 2017.  The previous director, Amy Hertel, had stepped down and moved into the chancellor's office.  And they needed someone to -- to step in.  And they reached out to me.  And I'd been involved with the American Indian Center on their internal advisory board and just an active member of the community.  And so I started as interim.  It had originally, both before when Amy was there and now with the current director, as -- as a full-time staff position.

And so the -- the search for a staff member that didn't work out the first -- that first search.  And I wound up being the permanent director.  So I was still a



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 8 of 79

faculty member at the business school. Still teaching my full load there. But I also was, I guess, there approximately half-time, though at -- at times was all the time when I wasn't teaching or like in the summer when I wasn't -- you know, when there was not classes at -- when there are periods when I was not teaching I was there all the time.

Q. Okay. Just want to break that down a little bit. Who's Amy?

A. Yeah, Amy Hertel, who is now the executive vice provost. I think that's her title. For a while under the previous chancellor she was chief of staff. And then before that she was a director of the American Indian Center.

Q. Okay. And you mentioned that when she was there and then also person that was after you. And who was the person that was after you at the American Indian Center?

A. The current director now -- and I'm just drawing a blank.

Q. Okay. If you think of it later will you let me know?

A. Sure. Sure.

Q. Okay. And you mentioned that Amy and the current director are full-time staff?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    Right.  They're full-time positions as director of the American Indian Center and they were not faculty.

Q.    Okay.

A.    They may have been teaching, or had an adjunct appointment, or something like that.  I'm not --

Q.    Okay.

A.    I'm not sure.  But they came in to be the director.

Q.    Okay.  And can you -- do you know why that didn't happen when you held that position or can you walk me through that a little bit?

A.    Well, like I said, they were -- there was a search for another staff member while I was interim.  That search didn't result in a -- a hire.  And then I expressed interest as staying on as the permanent director.  And I had been doing a -- a good job, I think, in that.  And so yeah, I was -- I was moved into that position as the permanent --

Q.    Okay.

A.    -- director.

Q.    I'm just trying to figure out just --

A.    Sure.

Q.    -- the full-time staff or that.  Could you have -- I guess at that point could you have just served full time as the director and then dropped your teaching load or how would that have worked, I guess, in --



800.211.DEPO (3376)
EsquireSolutions.com

A.   I probably could have.  Just became a full-time director.  But I'm still a professor at -- like I -- I value being a professor.  And so I -- I felt that that -- I don't know that I considered that.  And, also, it would have been logistically quite a big pay cut from what I was making in the business school.

Q.   Fair enough.  What were you making as director of the Indian Center?

A.   It was an additional administrative payment of, roughly, $70,000 a year.

Q.   Okay.  Okay.  So you were there 2017 to 2021?

A.   Yes.

Q.   Why did you leave in 2021?

A.   In 2021 I stepped down.  There were serious budget issues with American Indian Center.  I was always, kind of, juggling and trying to keep everyone employed.  A lot of the -- I didn't completely understand the funding before -- how the center was funded before I started.  Once I got there, there was a lot of grants, soft money that was expiring.  And it -- yeah, so I -- I think out of frustration with that, in part, to make a statement that the American Indian Center could be better funded -- needed to be better funded I -- I stepped down.

Q.   Okay.



800.211.DEPO (3376)
EsquireSolutions.com

A.   I was also the next -- in -- in that fall of 2021 starting a year-long fellowship through the American -- the ACE, American Council for (sic) Education, if I get the acronym exactly right.  And I wasn't going to be -- if I'd stayed on and, kind of, remotely managed the American Indian Center during that year well they likely wouldn't have been able to pay me.  I mean, so that was -- like it was a really strapped for funding.

Q.   Okay.  So just, kind of, make sure I understand the chronology there.  While you were still director you accepted the fellowship -- and we're going to talk about that, because I want to make sure I understand the dates and all that --

A.   Uh-huh.

Q.   With the American Council for (sic) Education?

A.   Yes.

Q.   How long was the fellowship?

A.   One year.

Q.   And then would you have been able to -- and so you're not -- are you -- strike that.

     Would -- are you uncertain if you'd been able to continue as director while also on that fellowship or was that ever considered?

A.   I could have continued as director while I was on a fellowship.  They -- there probably would have had to


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

have been an interim director of some sort.  But I -- in that program many people -- I mean, the -- the normal route was that people maintained their positions. Because you're -- you're sponsored by the university. You're nominated by the university.  And -- and I think there's also an agreement with that fellowship that they -- while you're away.  So I could have come back as director.

Q.    Okay.  But you chose to -- in addition to the fellowship you wanted to -- due to your frustrations with the funding decided to step down?

A.    Yes.

Q.    Okay.  So tell me a little bit about -- and we're going to mention it later.  I don't -- I didn't see it on the CV, so I want to make sure I understand it.  It was -- when did you start your fellowship with the ACE?

A.    That would have been the following fall.  So I stepped down in -- as director in the summer of 2021 and then not long after -- that was, oddly, in August when I stepped down.  In late August or early September I went to the University of Denver.

Q.    Okay.  Tell me a little bit about University of Denver, what was at that program?

A.    I was there to work with the administration to learn more about being an academic administrator.  So I

 
Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 13 of 79

attended cabinet meetings, either the chancellor's cabinet or the provost's cabinet.  I say chancellor.  They may have a president.  But -- so, yeah, I was there to -- to learn more about what happens behind the scenes and the things that faculty members -- that I wouldn't have known as a faculty member, even a center director, about leading a university.

Q.  Okay.  And that was supposed to -- you -- I think you -- strike that.

I believe you noted a moment ago that you were nominated by the school.  Does that mean UNC of Kenan-Flagler?

A.  That -- by -- by UNC.  My exact nomination came from then-Executive Vice Provost Ronald Strauss.

Q.  Okay.

A.  Though it also had the support and letters from Kenan-Flagler.

Q.  Okay.

A.  Because Kenan-Flagler continued to pay my salary while I was on that fellowship.

Q.  I was going to ask that question.  And the purpose of the fellowship, as you noted, was to learn more about the inner workings of the university or --

A.  Yes.  Yes.

Q.  Okay.



A.   It's an academic administration training fellowship at --

Q.   Is it something you'd applied for or asked to be nominated for?

A.   I'm -- I'm -- I forget how it initially came up in talking with Dr. Strauss.  I likely expressed interest, but he -- it may have come up in our conversation with him some other way.  He was, and is, a mentor of mine.

Q.   Okay.  And you mentioned a moment ago -- and I apologize, I was taking notes on something else.  Dr. Strauss' role at that time was what?

A.   If I -- if I had to title exactly correct it's executive vice provost, but he was in the provost's office over faculty affairs.

Q.   Okay.

A.   Among other things.

Q.   Okay.  So not at Kenan-Flagler, actually --

A.   He was not at Kenan-Flagler.  Correct.

Q.   Okay.  You mentioned that he was a mentor of sorts to you?

A.   Yes.

Q.   When did you first meet him or start to interact with him?

A.   If I recall correctly I met Dr. Strauss through my work on the UNC Faculty Council.



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 15 of 79

Q.   Okay.  Do you remember what year that might have been?

A.   I give the years of -- I'm looking at my CV to see if I give the years that I was on the faculty -- so I was -- I served as a Kenan-Flagler representative on UNC Faculty Council from 2013 to 2016 and then again in 2019 to 2021.  I can't remember if I met Dr. Strauss during that first period or the -- early in the second.  Certainly I started talking to him more around 2019 --

Q.   Okay.

A.   -- or so.

Q.   I'm just curious what made you see him as a mentor or that type of role?

A.   He was, I mean, one, just a very kind person who took an interest in me.  He understood -- seemed to understand what a -- you know, a bit about my background being a -- a member of the Lumbee Tribe of North Carolina.  And, yeah, was interested in -- in, yeah, helping folks who -- yeah, I don't -- I don't -- we just hit it off personally, I think, is the --

Q.   Fair enough.

A.   -- best way to explain it.

Q.   Okay.  So going back to the fellowship at ACE.  It was supposed to be for the entire '21-'22 school year; is that right?



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 16 of 79

A.   Yes.

Q.   Were you there for the entire '21-'22 school year?

A.   I was not.  I left University of Denver in late -- or early in December of 2021.

Q.   Okay.

A.   The -- I was not spending as much time with the -- the chancellor there as I hoped to.  As was, kind of -- I felt was promised to me as part of the program.  So it didn't seem that beneficial.  I came back to UNC in -- in December of 2021.  After spending the first term -- I don't think they're on semesters.  I -- I -- if I recall correctly they're on quarters.  But I was there for the fall and participated in the fellowship program then. But I came back --

Q.   Okay.

A.   -- to North Carolina in December.

Q.   So were you teaching at UNC again for the spring of 2022?

A.   My classes that were scheduled to teach in the spring -- that I would've taught in the spring semester, had I not been on leave, I -- there was still a chance of getting another posting in the spring to another university.  Tried to work that out.  It didn't.  So I did not teach my spring undergraduate classes.  I started teaching again in the summer, but I worked with



our senior associate dean at the time, Dave Hofmann, to -- rather than UNC pay for the whole year away, they paid for one semester, or -- or half of my credit. So I had a six credit hour leave. I was responsible for teaching for 12 credit hours. And so I taught the other six credit hours during -- if I recall correctly, mainly during the summer.

Q. Okay. I just want to make sure I understood that because that was a lot right there.

A. Sure.

Q. Come back in the spring. Your normal workload is 12 hours.

A. Uh-huh.

Q. You don't teach any undergraduates that -- any undergraduate classes spring of '22?

A. Correct.

Q. And then you work with Dave Hofmann where they covered half your salary, so the six hours.

A. Uh-huh.

Q. And then for the remaining six hours, you didn't teach them in the spring of '22, but you did teach them in the summer of '22, right?

A. Which didn't -- in the -- particularly in the business school, you think of the school year, like, the full school year, from July to June.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

of a university president or chancellor. And other fellows had had experiences of literally being with a chancellor all the time. And one story that particularly stuck with me was the chancellor at UNC Charlotte. After there was a shooting there a few years ago, their ACE fellow had been in the chancellor's office that night after the shooting, helping -- you know, observing as they plotted next steps, how to deal with this incredible trauma and crisis. So that's the kind of experience. Not that I -- yeah. Obviously didn't want to be in that sort of situation, but I was hoping to have that level of access. And Dr. Haefner had been in -- had been an ACE fellow before, but at -- when I got to University of Denver, I did not have that -- anything close to that kind of access.

Q. Okay. And I'm looking middle of the paragraph. Sentence starts with, "When I." I'm reading, "When I couldn't take it anymore and sent him a few emails expressing my 'deep regret' at choosing DU, he convinced Robin and Anita" --

Who are Robin and Anita?

A. They were ACE staff in charge of the program.

Q. Okay. "That I was out of line and needed some kind of anger training." And then you say, "I moved myself with a U-Haul trailer into an unfurnished campus



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

apartment."

So walk me through that a little bit more. So you sent a few emails. What all did you say in your few emails in which you expressed deep regret, if you remember?

A. I don't remember the exact wording. I certainly remember the topics. You know, I expressed to him, you know, that I didn't have access, that I'd gone through a lot. Like I say here, I had moved out to Denver at great expense, personal expense that was not covered by the program, and expected to have this really transformative experience that would help propel me to kind of a university leadership. And when that didn't happen, it was hard. It was really hard to -- to understand, and it -- it just seemed like a bit of a bait and switch.

Like, I've been promised this -- these kinds of things, and other ACE fellows in my cohort -- there's a cohort of, I forget the exact number, somewhere 20 to 30, something like that. Other people were having those kinds of experiences. And -- and I had also had the chance to go to University of California at Davis, and had turned down their chancellor to go to the University of Denver. And it was disappointing that I didn't have that -- that access. And I expressed that to him.



800.211.DEPO (3376)
EsquireSolutions.com

Q. I've got two quick follow-ups at that. The other fellows, were those at University of Denver or at other institutions?

A. No. At the other institutes. They were placed across the country.

Q. Were you the only fellow at that time in University of Denver?

A. Yes.

Q. I guess I'm just trying to understand, were you surprised when he responded by saying you needed some kind of anger training? Was there other more forceful language in there in those emails?

A. No, I was -- I was surprised. I think he was not used to having someone disagree with him and not just -- not just accept the instructions of the -- the chancellor or president.

Q. Okay. Do you still have those emails you sent?

A. I -- I should. One -- one -- and I say, I should. I -- I likely do. I could look for them, but I -- one challenge through this whole process is I don't have my UNC email --

Q. Okay.

A. -- anymore, and I couldn't figure out a way to download all of that -- all of the emails. And I -- I actually requested to get them electronically from the


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Kenan-Flagler IT --

Q. Okay.

A. -- department, and that was denied.

Q. Okay. So these would've been from your UNC email address, these emails?

A. Yes. I'm -- I'm pretty sure. Well, and then some of them might have been from my University of Denver email account at the time, and that's just completely gone.

Q. Okay. Okay. Just one more thing, and we can move off this. I'm going to the next paragraph. First sentence: "It is hard for me to get away from the fact that my placement at DU didn't work out, and it is a place that isn't welcoming -- welcoming to Natives." Talk me a little bit through that.

Was -- were you, at the time as a fellow, were you working with -- and I'm assuming when you say "Natives," are you referencing other people that were -- identify as indigenous or Native American, or just walk me through that.

A. Sure. Part of the reason, or a -- a lot of the reason that I chose the University of Denver is they had publicly committed to working on a host of Native American issues.

Q. Okay.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   The University of Denver is the pioneers.  Their mascot is the pioneers, and -- and then one of the -- I may get some of the details wrong, because the -- their historical details.  But one of their founders was also involved to -- in some way of giving an order for one of the worst Native American massacres in U.S. history, the Sand Creek Massacre.  And so at the time, there had been a lot of discussion at the University of Denver of how we move past this history.

And they had a website with a -- a whole list of programs and initiatives that they would have to better embrace the Native community and to reckon with their history.  And when I got there, I think the -- the other side of that was the -- the Native faculty and staff, at least many of them, yeah, did not feel great about the chancellor.  And -- and I thought I was going into work with someone who had really embraced the -- the Native community, and -- and that's not the way that at least some of that, or a large part of that community felt.

Q.   Okay.  How many faculty members were Native faculty members, as you referenced them?  And if -- I'm not asking for, like, an exact number.  Ballpark, if you got it?

A.   Few enough that we could all have lunch at the same table, so maybe five or six, or something like that.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 23 of 79

Q.   Five to ten, maybe somewhere in --

A.   Somewhere in that range.  And -- and there may have been others that I didn't know, but the ones who I was sort of meeting with regularly socially, and also, you know, as part of campus activities and -- and learning about what they do on campus, yeah, somewhere in five to ten.

Q.   Okay.  And those five to ten faculty members were not a fan of Jeremy Haefner?

A.   No, they -- they were not, at least by and large.

Q.   Understood.  Let me get this.  Just going back, and we're going to move to another one.  Just going back to your CV.  I'm just curious here.  You referenced in here that -- I'm on the first page, Chavis 1065.  You list four different positions:  assistant professor, clinical assistant professor, clinical associate professor, and clinical professor.  And then you have a short little synopsis here in which you say you, "Were deeply involved across all MBA and undergraduate programs, including online delivery, taught core and elective economics courses, created -- created innovative applied learning courses, brought together practitioners and researchers to engage over pressing public policy issues, and guided the globalization of the business curriculum, to name a few initiatives."



800.211.DEPO (3376)
EsquireSolutions.com

And I'm going to talk about the different roles a little more in depth, but does that synopsis apply to all four of those positions, does it apply to certain positions, or is it kind of are there parts that apply to one and not others?

A.   Yeah, that -- I think that is an overall synopsis of my time from 2006 to 2024.

Q.   Okay.

A.   But not all of those things were happening at the same time.  And in all of those positions, for example, the globalization of the business curriculum was a global education committee that I was involved in sometime around 2015, give or take.

Q.   Okay.

A.   Yeah.  So that was -- that is definitely an overall synopsis of my time.

         MR.  PADGET:  Okay.  I want to talk a little bit about the different positions and as we do, I want to talk -- I'm going to show you what is going to be Exhibit 4, which are some of your different contracts you've held at UNC.

   (Defendant's Exhibit 4 was marked for identification.)

BY MR.  PADGET:

Q.   So when you came to UNC in 2006, you came as a



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 25 of 79

tenure-track professor; is that right?

A.    Yes, that's correct.

Q.    That's what you were hired as?

A.    Yes.  I was hired on the tenure-track.

Q.    Okay.  Walk me through that process, kind of what you came in, what you were studying, and kind of the first few years as a tenure-track professor.

A.    My degree -- my Ph.D. is in economics, particularly economic -- with the focus on economic development, among other things.  I was hired in the entrepreneurship area to teach at the time, what were courses that were broadly described as sustainability, particularly hired to teach International Development, both to undergraduate and MBA students.  Pretty quickly, there were challenges in -- in finding faculty members who could teach the core microeconomics course, and it wasn't long after I arrived that I started teaching that within the first one to two years.

It wasn't the first year, maybe in the second or third year, I started teaching core economics in the evening and weekend MBA programs.  But that -- those courses are listed under the finance area.  And while I had initially interviewed with finance, they did not hire me for a position in finance, and they passed my name along to the entrepreneurship area chair, and I


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

eventually interviewed with entrepreneurship.

Q. Okay. Kind of walk me through that a little bit. So inside the Kenan Business School, there are different sections?

A. Right. We call them areas. I think in most places you call them a department.

Q. Okay. Different areas, departments?

A. Uh-huh.

Q. One was finance, and you were in -- was it just entrepreneurship, or is it --

A. It was just entrepreneurship at the time.

Q. When did that change?

A. Well, I don't know the exact year, but at some point, strategy and entrepreneurship merged. I -- I'm guessing sometime around my third or fourth year.

Q. Okay. To a layman that has not gone to business school, what's the difference between strategy and entrepreneurship?

A. Yeah, it was quite a big -- it was a change for me. In entrepreneurship, there had just been a few key faculty members, a few, and I was -- I came in, and then even in my first year, I was leading, like, the search committee for new junior professors so I had a lot of responsibility, was helping to shape the department. At least that's a -- pretty sure that -- that -- those


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

search committees were in the first year, maybe the second year, maybe both. But there were just -- it was a very eclectic group, and so there were a lot of ways to fit into entrepreneurship.

Strategy had -- the strategy group of professors had been part of the organizational behavior or management. I forget exactly what they called it, but they had been part of another area, and the dean at the time moved them to -- out of that area and created a new area that was strategy and entrepreneurship.

Q. Okay.

A. And strategy is a -- a different discipline, one that I'm -- have some overlap with, certainly, and wound up teaching some strategy courses, but it was -- it was a much larger, very different area.

Q. Did your supervisor change?

A. Eventually, it did. I can't remember if it changed -- I don't think it changed right away, but this I -- I'm not recalling. Our head of entrepreneurship may have been also the head of strategy and entrepreneurship for a while, but eventually, it did change from Al Segars to Chris Bingham.

Q. Okay.

A. I think it was a direct -- I -- I don't think there was anything -- anyone between them. Al was the area



800.211.DEPO (3376)
EsquireSolutions.com

chair of entrepreneurship that hired me.

Q. Okay. So Al Segars was the area chair that hired you, and then Chris Bingham was still area chair when you left in 2024, correct?

A. Yes.

Q. Okay. And that at some point, you know, that that -- basically, my moment question that I want to see, it wasn't as though it became strategy and entrepreneurship and immediately, a new supervisor came in. It was more eventually Al Segars transitioned or left, and Chris Bingham became area chair?

A. Yes.

Q. Okay. All right. So the first document I'm looking back at Exhibit 4, it was when I believe, it was still -- you were still on tenure-track at this time. And as a part of the tenure-track process, after three years, you are -- either are or are not reappointed.

So is this appears to be your reappointment letter when you're still on tenure-track; is that right?

A. Yes. This -- this looks like it's my reappointment letter for a second three-year tenure.

Q. In my understanding of the tenure process, and please correct me if you have a different understanding, is that it's supposed to be normally, not all situations, but in those situations, it's done on a six-



year track and you have a three-year part, and then at the three years, you're either reappointed or you're not, and then you're reappointed for an additional three years. And at the end of that period is when you normally go up to tenure.

Is that -- was that your understanding as well?

A. Yes, there is -- I don't think it says it here, but my recollection is, because I think I took advantage of this, is that you can get a fourth year. You could go up in your third year --

Q. Okay.

A. -- or as a transition out, they give you a fourth year to, you know, start to look for a job, or if you're going somewhere else, something like that, you could go up. Now, let me back up to give a little more detail. In your -- there's a -- my understanding with that, there's a fourth year -- say you went up in your third year, you did not get tenure, you would have a year to look for another job. Some people go up for tenure in their fourth year, if I -- if I remember correctly. But then that means you don't have an extra year if it doesn't work out.

Q. I got you. Okay. Let me make sure I understand what you're saying. So not in the first -- so you have the initial three-year period --


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.  Yeah.

Q.  -- which is when you reappointed, is what we have here.  And then you have that kind of second three-year window, and you have the option of either going up in your third year, and if you don't get it, you at least can have an additional year where you're at the university, you're employed, and you're looking for other jobs.  Or, you can say, I'm going to wait because I'm still working on my tenure application to the fourth year go up.  But if you don't get it, you're out of a job.

Is that -- was that your understanding?

A.  That -- that's -- that is a normal track.

Q.  Okay.

A.  A frequent track.

Q.  So that's 2009, and the effective date was 2010, so it would've gone through July of 2013.  And the next Page I'm looking at is Chavis 1520, which was March of 2013.  And I'm reading from the first line here.  It says, "Dear Larry, after your decision and request not to come up for a promotion of review as tenure-track faculty, I'm excited that you decide to stay at the school as a clinical assistant professor."

So at some point during that three year period, decision had been made for you to leave the tenure-



800.211.DEPO (3376)
EsquireSolutions.com

track; is that right?

A.   Yes.   I never went up for tenure.   I never applied for tenure.   Didn't apply.

Q.   Why was that?

A.   It -- it wasn't clear that I would get tenure, and if I didn't get tenure, I would've had to leave.

Q.   Okay.

A.   And with those three children all in school here in Chapel Hill and we were pretty settled, I didn't -- I thought there was a chance of tenure, but I didn't want to -- to risk it.   I didn't feel that particularly with the new area being strategy and entrepreneurship, that I had the level of support from faculty members that I had initially as part of entrepreneurship.   So I decided to stay, and -- and North Carolina was home.

Q.   Okay.   My understanding is in most tenure-track situations, there were kind of three buckets:   teaching, service, and research, broadly?

A.   Yes.

        MR. PADGET:   And it seems as though -- and I'm going to mark this as Exhibit 5.

     (Defendant's Exhibit 5 was marked for identification.)

BY MR. PADGET:

Q.   Again, this is not the entirety, but an excerpt



800.211.DEPO (3376)
EsquireSolutions.com

of -- if it's okay, just for the record, I'm going to call that your manuscript.  Or if you have a different term you prefer me to use, I'm happy to use it, but I'm referencing that 200 some odd page document that you sent to us that you said you did as part of your creative writing.

A.    Manuscript is the fine way to --

Q.    Okay.  Just -- and this is Exhibit 5.  And here, from a section that you wrote, and it starts on Chavis 2141, excuse me, called, "No tenure."  And it's discussing -- it appears to be discussing, and correct me if I'm wrong, some of the issues that you had leading up to the decision to go up for tenure.

Does that appear to be right?

A.    Yes.  This describes the period pre-tenure, and then that decision to go for tenure or not.

Q.    And I'm looking at the fourth full paragraph on the first page.  It starts off with, "The advice always." It says, "The advice always given to new faculty was just to" -- excuse me, "was to just focus on your research, be ruthless about self-preservation.  I never mastered that attitude."  So as it appears from your own words here, and then it goes down -- sorry, to have different -- I'm looking at the bottom, the different bullets where it's June 6th, the various years, and I'm



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 33 of 79

not going to read all of them, but it seems to be each one, year to year, telling you to kind of perhaps focus more on research.  One of which come from June 6th.  "We need -- discussed the need to rationalize your teaching schedule and free up time to accelerate your research productivity."

So looking at that, is it fair to say that there was an issue with some of your research output at that point?

A.    Yeah, there was -- I mean, certainly of the -- you know, personally, I felt my research was solid and comparable to other faculty members who had received tenure at -- at least in -- by some measures.  But yes, of the three buckets, teaching, research, and service, I -- I was doing well above -- better than -- you know, I mean, excellent in both teaching and service, and so giving a lot to the school, but that often meant not as much time for research.

Q.    Okay.  What was your research focus?  I have to ask.

A.    At the time, I was finishing up research that was part of my Ph.D. dissertation, publishing those -- those three papers, and then was working on a series of papers with co-authors -- among other things, but there was one key series of papers with co-authors at the World Bank



800.211.DEPO (3376)
EsquireSolutions.com

on small business financing, comparing across countries.

Q. Okay. So was it kind of that -- because you noticed that teaching, service, you didn't really have concerns about that?

A. No.

Q. And it was concerned about the research issue that ultimately led you to decide not to go for tenure; is that fair to say?

A. Yes. No, I was worried that my research would not be valued by the tenure promotion committee.

Q. Valued in what way?

A. My background was in economics, and there's not an economics group in the business school. So I was going to have to explain my publications to folks who -- yeah, there was not -- the -- the challenge for me overall at -- the position was, I was not part of an economics group with other people who were doing -- with many other people. There were one or two people in finance that I worked with, but the people that were doing overlapping research with me.

Q. Okay. And was it also -- and again, I'm looking back at documents, Chavis 2142, up at the bullets. Was there an issue also with that some of your research was getting published in certain journals or certain publications, but not normally the ones that are



800.211.DEPO (3376)
EsquireSolutions.com

generally more accepted in the tenure process?

And the reason why I'm asking that is I'm looking at the June 18th, 2011, that's a quote, "You're making progress in your research career, but remember to keep focusing on the top journals."

A. Yes. The -- what is a top journal in the business school is subjective, though it is -- I mean, it is defined by the -- the business school based on various negotiations between the different areas. And since there was not an economics area, that some of the -- the key journals that I was focused on, even though they had impact and were being cited, weren't -- were not considered by Kenan-Flagler definitions, to be top journals. So I would have to argue for each journal in a way that I would not have if my publications have been on that list.

Q. Okay. So going back to Exhibit 4, which are your different contracts. So starting -- you have contract, and this is Chavis 1520. You're going to stay on as a clinical associate professor.

Were your roles and responsibilities different in those two roles once you left tenure-track and became fixed term, and you -- and I'm talking -- looking more in those first few years?

A. Initially, the positions were not that different.



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 36 of 79

My teaching load went up from nine credit hours required, which is roughly the equivalent of three semester long courses, to as it says here, ten and a half credit hours. That eventually went to 12 credit hours at some point. I had the same base salary. I would imagine it didn't go up at the same rate that it would have if I received tenure, and I didn't get the two nights bonus of a summer research support.

Q. Okay.

A. So tenure-track research faculty members generally get two nights of their base salary during the summer as an incentive to keep that summer free for -- for research. That's my understanding.

Q. Okay. And then just I don't want to spend too much -- it then appears that for the next few years, you worked on a series of one-year contracts? I'm looking at 2013, 2014, and 2015.

A. Yeah.

Q. Was it your understanding, is that the normal practice with the -- like, a relatively new fixed-term employee, or how did somebody -- walk me through that process a little bit.

A. I think initially, it is very common to be on a one-year contract.

Q. Okay. And then in 2016, and this is a little


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

weird, but you received a five-year contract; is that right? And I don't -- I don't know the answer to this, and I want to -- I'm looking at UNC 722, which is dated -- it's confusing, and that's kind of why I have a question. You may not know the answer.

This is dated November 5th, 2020, but it states, and I'm looking at the first full paragraph at the very end, that you received your contract had been approved to be effective July 1, 2016?

A. Yes, it --

Q. So --

A. -- it does seem that the date on that is -- is incorrect.

Q. Because you were working -- correct me if I'm wrong. But my understanding is that you were working on a five-year contract, based on this, which was effective July 1st, 2016, fixed term.

And then I'm looking at the bottom under duration, "Terminating June 30th, 2021"?

A. Yes, that's my --

Q. Is that right?

A. -- understanding as well --

Q. Okay. All right. And then -- and then in 2021 -- I'm looking -- jumping up a couple pages. You were again -- you were -- and this is Chavis 1529.



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 38 of 79

April of 2021 you were then offered a two-year contract; is that right?

A.   Yes.

Q.   And that would have been when you were going to the ACE fellowship we were talking about earlier, correct?

A.   That is correct.

Q.   I believe, from what I've read, and I can find it, you had requested a two-year contract because you were going on that fellowship; is that right?

A.   That -- that is true.  I -- I requested a -- a two-year rather than going through the process of -- of getting a five-year.  And I -- I had hoped that after that the -- that the ACE fellowship would lead to other opportunities, potentially.

Q.   Just to make sure I understand that.  It was you requested, rather than having the full five-year, it'd be shortened to a two-year because you were hopeful that either the ACE or something else may have allowed you to have opportunities outside of UNC?

A.   Right.  I -- I don't remember the -- the exact discussions I had with then-Senior Associate Dean Dave Hofmann, but I did say that, you know, I would like a two-year contract.  And I'm not sure whether the offer was to give up another five-year contract, or whether I would have to apply, or what that -- what the process



800.211.DEPO (3376)
EsquireSolutions.com

would have been if I had not said that. I'm -- I'm not -- I don't remember.

Q. Okay.

A. But yes, that --

Q. Okay. So you worked under the two-year contract that you requested. And then in the middle of that -- and I just kind of what to understand this, too. Sorry. Hold on. Strike that.

I apologize. Yeah. So now I'm looking at Chavis 1531. So you request the two-year contract because you were going on fellowship. You come back early. And you came back in the spring or you left for fellowship in December 2022. You come back to UNC spring-summer 2022.

And then that summer you're promoted; is that correct? From --

A. Yes, I was. Just going by the dates here in the -- I can't remember when the application started exactly. But when I got back from Denver in late 2021 -- either in late 2021 or early 2022 I started the process of applying to be promoted to what we would term full clinical professor, rather than associate clinical professor.

Q. Okay. I just want to make sure I understand the timeline well. So you get the two-year contract in



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 40 of 79

2021.  UNC then nominate or paid for, however you want to say it -- for you to go to the fellowship.  You end up leaving that a little bit early.  Come back in spring of 2022.

And then at some point, you're not sure exactly when, you applied for the full clinical professorship role?

A.  Yes.  I applied.  Kind of a promotion in title, but not -- and there was a -- a raise, I -- I think, associated with that as well.  But, yes, I applied to -- after I came back from Denver I applied to be promoted to clinical professor.

Q.  And then you received that promotion --

A.  And I did receive the --

Q.  Okay.  And the last one, it's the last contract, and I -- we'll have additional conversations about the length later.  But you did receive one more, and it's on -- and I'm looking at Chavis 1533.  June of 2023, which was a one-year appointment.

And, again, I believe with this was a -- with a salary increase to almost 204,000; is that right --

A.  Yes, that's what -- yes.

Q.  All right.

A.  Yeah.

MR. PADGET:  And we've been going for a little



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 41 of 79

bit.  I have -- I think I can do -- I have a couple exhibits, but it's not going to take me long.  And then I think we'll be -- we can take a break.  But let me just -- this one, I just was curious what it is.  We'll mark it Exhibit 6.

(Defendant's Exhibit 6 was marked for identification.)

BY MR. PADGET:

Q.   Appears to be some type of faculty mentorship program, which -- you received a stipend.  I just -- we don't have to spend a lot of time on it.  I just -- I didn't know what it was.  And just get you to explain it to me.  It's dated July 14th of 2023.  It's mentioning, "A faculty member of the UNC Scholars Program with our Blue Sky Scholars."

Do you remember what this is?

A.   Yes, this is the -- the Office of Scholarships and Student Aid has a program where they match students with faculty members.  Groups of students.  So for the 2023-24 school year I was a mentor for a group of students. I'd say eight to ten, if I recall correctly, students who had received the -- they were incoming new first-year students who had received a Blue Sky scholarship, which is a -- I'm going to forget the exact nature of it.  But it's along the lines of a financial aid --


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

financial scholarship for middle -- middle income students, if I --

Q.   Okay.

A.   -- recall the parameters correctly.

Q.   Had you done this before or was this a first time form?

A.   I -- I had no -- this was the first time that I had served as a mentor in this -- this program.  And so there is a -- both a stipend for the faculty member, for -- for the time that you spend.  And then also a -- a budget to take students out to dinner, gather in different ways.

Q.   Cool.  So you got a -- it was a 5,000 annual -- $5,000 annual stipend and then your budget of up to 2,500 for those yearly --

A.   Yes.

Q.   Yeah.  All right.  I was just -- I haven't seen that.  I was just curious what it was.  The next thing is just a quick recap of some of your taxes that you provided to us.  And I just had a few questions about some of the years.

          MR. PADGET:  This is Exhibit 7.

     (Defendant's Exhibit 7 was marked for identification.)

BY MR. PADGET:



800.211.DEPO (3376)
EsquireSolutions.com

Q. I'll represent to you these are just snapshots of some of the tax returns you provided to us in discovery, ranging from years 2019 up to 2024. And my main question is -- I just wanted to clarify a few things.

Throughout this period were you the only -- sorry, strike that.

Were you filing this jointly with your wife at the time, for these years?

A. Yes, to the best of -- I've always done --

Q. Were you the only wage earner at that time or was she working as well?

A. I was the only wage earner.

Q. Okay.

A. She may have had a small one-off, but no permanent employment.

Q. Okay. So I'm trying to understand a little bit. So I'm looking -- first page, which is Chavis 1331. And it's 2019 wages, tips, compensations, 331,637. And I think at the time your salary at UNC, or through the business school, was 150, roughly. I recognize it's been six years ago.

Do you remember what accounted for the $180,000 difference there?

A. Yeah, it is a -- very common in the -- for Business School faculty to teach extra for classes. To have



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 44 of 79

other assignments, either within the school or in my case, like, being director of the American Indian Center.

Q. Okay.

A. So part of that -- like I said I had about -- 70,000 was from being director of the American Indian Center. The -- there was teaching of extra classes over the 12 credit hours that I was required to teach. And then also, paid for being coordinator of the core strategic economics course and the MBA at UNC program. But that's the biggest chunks of that. There may have been other things, but that --

Q. Okay.

A. Those are the --

Q. I'm just curious, common to teach other classes above your load -- your 12-hour requirement. I'm just curious if -- how much would you say -- I don't know.

A three-hour class, what would be the additional compensation for that?

A. It's a standard in the business school. It may have changed since I left. But during my last decade-plus if you taught three extra credit-hour course, like a standard undergraduate course, the extra compensation would be $20,000.

Q. Okay. And then the last one I knew, the AIC



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 45 of 79

director.  We don't need to go through that again.
Coordinating core economic -- I didn't quite catch the
last part, I apologize?

A.    Right.  That -- our MBA at UNC program.  I was
the -- what was termed the lead professor for a four-
credit strategic economics course.

Q.    Okay.

A.    That all students were required to take.  As the
lead professor I recorded lectures for that course, as
well as created asynchronous material.  Each week the
students had a couple hours of video lectures, and other
material they went through, before they went to an hour
and a half live Zoom session with a section professor.
And then in between that lead professor and the section
professor is a coordinating professor who makes sure
the -- the section professors are -- are teaching, and
prepared, and have the resources they need.  And that --
I'm going to forget the exact compensation for that.  It
had been a -- a flat $80,000 per year for some time,
from 2011 on.  And then some -- at some point, a few
years later -- several years later it changed to
something like 3 to $5,000 per section that was being
offered, so it became variable.

Q.    Okay.

A.    And so that was a significant source of



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 46 of 79

Q.    So this had nothing to do with race, ethnicity?

A.    Well, I do think, as a general, I mean, I think -- I don't have the numbers in front of me.  The -- my -- my impression was during the time of the business school, that women and minorities were more likely to be teaching professors than tenure track professors.  If you just look at the numbers of fixed term faculty in the business school, the demographics are meaningfully different.  Again, that's my impression between teaching professors and tenure track professors.

Q.    But you don't mention that here.  You just know those intentions of supporting research faculty over teaching faculty; is that right?

A.    I did not mention any.

Q.    Okay.  One other quick question, and we'll probably discuss this more later, because it's brought up other times.  I'll look in the next page, first of full paragraph.  "Early on in" -- and I'm reading.  Paragraph starts with, "Early on."  "Early on in my career here, the chair of the Tenure and Promotion Committee commented how happy he was to have someone on the faculty that is nominally Native American."

Who was that?  And when did that happen?

A.    His name is Wayne Landsman.  He is a tenured professor at the school in the accounting group.  And



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 47 of 79

he -- now, that probably happened within my first few years at -- at Kenan-Flagler. I -- I don't recall exactly when. It was sometime when I was still on the tenure track as an assistant professor.

Q. Was that comment related to your decision not to go up for tenure, or did that play a role in your decision not to go up for tenure?

A. In my mind, it was not feeling supported. Like, it was the just the chance that I would not get tenure. It was never -- that was not -- he did not make that comment in that -- in that regard, but I didn't -- you know, I didn't feel like I had -- it gave me one more reason to worry about the support that I would have on the Tenure and Promotion Committee.

Q. But you don't remember the year that happened?

A. I -- I don't remember the exact year. I -- I just remember it as being early on in my -- in my time at -- at UNC.

Q. Because earlier when we talked about tenure, you had noted that your biggest concern was your research and the ability to explain economics to the panel?

A. Yeah. And I think that is -- that is true. And -- and part of that explaining is how receptive is the committee going to be to your explanations. There's certainly personal dynamics involved. Measuring



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 48 of 79

did you say administration in general?

A.   Yeah.   I'm not -- I'm not sure because, you know, Ted doesn't quote me exactly.  So I -- I don't know what my -- I don't remember exactly what my phrasing was. But I imagine that I could have said that I applied. You know, Shimul Melwani, at the time, was the associate dean of the undergraduate business program, and that I was, you know, applying to work under her and would wonder how it -- how it would go.

Q.   Okay.  This was in 2022.  Okay.  Okay.  Just going back to the topics for a second.  You said you didn't want to put any broad general topics, like pass them aside.  What about topics regarding your personal life or any experiences?  Do you -- would you consider any of those to be inappropriate for classroom discussion?

A.   No, not offhand.

Q.   Okay.  Okay.  So this was in 2022.  Do you think this was the first time you discussed your job prospects with one of your classes?

A.   No, it was not.

Q.   It wasn't?  You remember the first time you did?

A.   I don't remember the first time, but it was probably around, as we discussed before, being passed over for the associate dean of the undergraduate business program.



Case 1:24-cv-00805-CCE-JGM     Document 50-1     Filed 03/16/26     Page 49 of 79

Q. I think you mentioned that was in 2017. Does that sound right?

A. Well, that was one time in 2017. But even before that, I'd been passed over once -- I think once before, maybe twice.

Q. Do you remember the first -- do you remember the first time you would've been passed over or you did not receive that role?

A. Sometime around 2013. It was as I was transitioning from being assistant professor to assistant clinical professor.

Q. And do you remember discussing that particular application with your students?

A. Yes. I -- I probably mentioned it in -- yeah, mentioned it in class, I think.

Q. Do you remember which class?

A. I'm guessing maybe my executive MBA class.

Q. What was the topic of your executive MBA class?

A. That was -- I mean, I taught both the core economics and core -- and some electives, economic electives, in the executive MBA program. And I would imagine that that was a tangent, like one might mention other tangents that are not at the center of what you're -- you are talking about. It was not related to an example of -- an economic example for class.



800.211.DEPO (3376)
EsquireSolutions.com

Q. So if it wasn't related to an economic example for class, how were your job opportunities relevant to one of the economics classes you were teaching?

A. They were relevant -- for me, relevant because I've tried to be the personable professor that -- that -- and let students get to know me. You know, I -- one of the -- you know, I would tell students stories about leaving a gallon of milk in the back of the minivan and the challenges of -- of getting that out.

It wasn't a large part of the class. You take a few minutes at the beginning of a two-hour class on the evening after students have been at work all day, trying to let them get to know you. And so that was often a tactic I took in -- in helping students feel comfortable in -- in the class and getting to know me as a person.

Q. Would you -- as you mentioned earlier with Shimul, would you often call out the names of the administrators involved in that decision to your students?

A. I may have. If someone were a leader, like Doug Shackelford, I might have called out their name, and not in a way of -- just as the person who made the decision or the person who said I had a reputation for ranting, but not -- I don't recall ever -- I certainly didn't call them names or that -- you know, was just part of, like, hey, this happened to me.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q. That was the end of the conversation?

A. As far as I recall, yeah. It was, like, a -- it was more -- yeah, example. This is some of the things going on in my life.

Q. So I think we went back. You said the first time was when you got passed over for associate undergraduate business dean -- associate dean, excuse me, in around 2013.

Eleven-year period, how many different times do you think you talked about your job prospects in your classes?

A. Yeah. I don't -- I'm not -- I -- I don't know. But like I said, I often started at classes with a few asides and that -- that was not a -- yeah. I'm not sure how to -- how to put a number on that. I don't -- it's not -- not that it's not -- yeah. I -- I'm not sure.

Q. Was it more than 100 times?

A. I'm pretty sure there was not more than 100 or even close to 100.

Q. More than 50?

A. I -- I would guess that it was not more than 50.

Q. More than 25?

A. It could be, but I don't -- you know, I -- I teach a lot of classes. And as you saw from my extra compensation that we went over, it could have been



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 52 of 79

mentioned, the same thing, through different sets of students. You see four or five different sets of students in -- at any one time in what you're teaching. It could have been.

Q. It could have been 25, 50 different times?

A. It could have been.

Q. I was just curious about this. And this is an email actually from later, but I just want to talk with you about something, you know, in here.

MR. PADGET: And I'm going to mark it. What are we at, 11?

(Defendant's Exhibit 11 was marked for identification.)

BY MR. PADGET:

Q. That's an email that you sent in May of 2024, in which we're going to get to that time period. And there's obviously other things to discuss there, but it was more about a sentiment you sent here that I want to ask about. It's the first paragraph at the top. It's an email you wrote to Brian Shamule, talking about a progress on an undergraduate course.

And the part I want to ask about is that -- it's a sentence where it says, "I understand." "I understand it may seem like an odd time to ask given my personal situation, but one thing I've learned over the" --


Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 53 of 79

excuse me, "I've learned over the past few years is to approach my core classes, and I see this as more core, and my electives very differently. I'm up front in my electives that I'm an acquired taste and I proceed with an unconventional approach. In the econ class I taught last night, it was all econ, though I think it was -- I think still an engaging class and very little Larry."

So walk me through difference between what you call core classes and your electives.

A. Yeah. I think that's something that I learned over time, that in my core classes, that maybe not all the students appreciated the personal approach.

Q. Okay.

A. And when I say "personal situation," I just mean my situation with my classes having been recorded and -- and that. So it's not I'm talking about my personal life outside of work. But what I mean is, you know, those -- those students, they're required to be there, and so I -- I provide a more general approach.

I would say that, by and large, I stopped telling as many personal stories and such or mentioning my job prospects or whatever else in my core classes, whereas in my electives I think that, you know, there were -- there are some students who appreciate getting to know a professor on a -- on a different level. And



800.211.DEPO (3376)
EsquireSolutions.com

so I could be a little more -- I -- I could try more things and -- and engage the classes differently.

Q. So in your core classes, you're saying it was, you know, you didn't mention job prospects, less personal information, more just kind of approach -- general approach to the course itself, and electives grad, a little more expansive?

A. Yes.

Q. What are your core -- what would've been your "core classes," quote, unquote?

A. So economics, classes that were required where all the students had to take. So I taught core microeconomics in the evening program and the weekend MBA programs. And the MBA at UNC program, those were the core. And then I taught electives, undergraduate electives, and in the evening and weekend electives.

Q. Okay.

A. And MBA and UNC, I also taught elective.

Q. Okay. So I have a number of questions that are going to take probably 30 to 45 minutes. Would you like to take a short break for lunch or what would you like to do?

A. We can plow through those.

Q. Plow through? Okay.

MR. PADGET: And then we can take -- well,



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 55 of 79

let's do -- plan to take a break after that and get a little --

THE WITNESS:  Yeah.

MR. PADGET:  If that works for everybody? Okay.  All right.

BY MR. PADGET:

Q.   So I have some questions about comments in course evaluations.

MR. PADGET:  The first document, which is going to be 12, are course evaluations from the summer and the fall of 2022.

(Defendant's Exhibit 12 was marked for identification.)

BY MR. PADGET:

Q.   I'm going to give you a chance just to look through these for a little bit.  I'll represent I believe it's three different courses, Microeconomics 957, Microeconomics 956.  Then the last one was Corporate Rivalry and Competitive Games 956 from fall of 2022.

A.   Okay.

Q.   All good?  Okay.  So I believe, unless I'm wrong, the summer -- the summer 2022, these would've been some of the classes you referenced earlier that you were teaching once you got back from your ACE fellowship.

Does that sound right?



800.211.DEPO (3376)
EsquireSolutions.com

A.    That is correct.

Q.    Microeconomics, just going off the conversation we had a moment ago, would that have been a core class or an elective?

A.    No, that's a core class.

Q.    I was a poli-sci major and didn't understand economics.  Tell me a little bit about what is general topic of your microeconomics class.

A.    Supply and demand, the basics of economics, and how similar topics like that apply to managers and -- and a bit to life in some ways.  Like, economics is very broad.

Q.    Okay.  And this would've been -- this was the weekend MBA class?  I think that's what it notes at the very top.

A.    The -- right.  The 957 section is the weekend class of '23.

Q.    Yeah.

A.    And the 956 is the evening class.

Q.    Okay.  What's the difference between weekend and evening MBA programs and regular just run-of-the-mill MBA program, if there are any?

A.    Right.  The full-time MBA program is students who are going to school full-time.  Their classes are generally during the day.  And then they have the summer


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

off, right, to do an internship or that sort of thing. And the evening and weekend MBAs are working -- generally, though not always, generally working professionals who are -- come to class either in the evening or -- or on the certain weekends.

Q.   Okay.  So I want to talk about some of the comments in here.  I'm looking at UNC 3866.  Get a visual on that.  I'm sure we'll discuss for a while, but I just want to talk about a few of them and get your -- how you responded.  Before I get that, I did note -- I'll note that the response rate was 13 of 53.

Did that -- was that in line with kind of your general expectations about how many comments or reviews you would get from students?

A.   I -- I would always like to get more and then you -- by reminding students.  My impression is that, in general, response rates are a lot lower since we -- you know, when I first started teaching, we passed out evaluations at the end of class.  Everyone was in class and you took class time to do it.

Q.   I'm going to read a few of these starting with the first bullet.  "While I think Larry is a kind-hearted person, I believe he was more interested in delivery of his personal agenda and viewpoints vice the topic of microeconomics.  He was always very enthused to talk



about the latest hot topic social item, but then he had to, 'refocus' on the actual course materials. He would often get distracted and go off on tangents, wasting valuable class time."

Another one I just want to read and I'm skipping to the third bullet, "This instructor used the majority of class time to discuss political and ideological views. While I do think that LGBTQ and race issues are important, I felt these conversations were overemphasized while the actual conduct" -- excuse me, "content on microeconomics was often less than a quarter of the lecture time. I understand that he is" -- I'm going to the next sentence. "I understand that he is unhappy with his position at the university and seems not to have been capable of setting aside his resentment over his own pain in order to teach the class in a professional manner."

I guess I want to -- just going off of those. We talked earlier about the difference between core classes and electives. And he's noted in core classes, you normally didn't talk as much about your personal agenda or bring up job prospects, but it seems like you might have in this class.

I'm just curious to get your -- what you remember.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    Yeah.  I would say I would refer back to Exhibit 11, where I said in May of 2024, "One thing I've learned over the past few years is to approach my core classes and my electives differently."  So I mean, this class and these -- and this feedback was part of that learning process, that not everybody received that in the same way.  I would vehemently dispute the -- the student's contention that we actually had class less than a quarter of the time or whatever it said like that.

That -- yeah, I did not -- I -- I am very certain that I did not spend the, quote, unquote, "the majority of class time to discuss political and ideological views."  That -- and yes, that -- because there's no way that -- you know, if that -- if that had been the case, then I don't think that, you know, 80 percent of the students would've said those who completed the evaluation would agree or strongly agree that I was prepared and delivered the course effectively.  I think those two things are in -- don't -- don't go together.

Q.    So going to the first part of the answer where you talked about how the email we had mentioned as Exhibit 11 was in 2024, and this was in 2022, and you were learning that personal agenda, your job status, complaints by the administration were not necessarily as appropriate in core classes.



ESQUIRE
DEPOSITION SOLUTIONS

Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 60 of 79

But at this point, you've been teaching at the university for 16 years; is that right?

A. Yes. That -- yes, somewhere around there, give or take.

Q. So up until this point up until, I guess, 2024, it was your understanding that it was appropriate to discuss personal beliefs, complaints about job status, complaints by the administration in core classes?

A. Well, I would -- one, I would take contention with saying it was my personal agenda. And even in mentioning personal beliefs, I was always very straightforward with students that I'm not the final authority on anything. I'm -- I am -- I may -- as my students say, I support -- I do, as students mentioned, support LGBTQ issues, but I was not -- I was clear that I was broadly accepting of -- of a range of students in their beliefs.

And -- and there are many, you know, comments that support that, like, students saying, "Larry made sure everyone felt included as the" -- this is on 3866, "Larry fosters an inclusive environment and is not afraid to say what is on his mind." That -- that is true. "Larry might be the most inclusive person, let alone professor, I've ever met." And -- and I really aim to be inclusive of the students from all kinds of



backgrounds.  That -- that includes a range of political beliefs, personal beliefs, religious beliefs.

Q.   This was, again, I think you noted earlier, and I might be wrong about this, but microeconomics was a course that was required for these students, correct?

A.   Yes.  What -- what I'll also add kind going back to, you know, your -- you've mentioned that I've been teaching for 16 years.  Yes, but I had not always talked about my personal beliefs to this extent in class.  I had not, had not, and it was a suppression.

And -- and also in this particular class, the summer of the weekend class of 2023 was a really hard class for me.  A -- a student who had been a member of that class died during one of our weekends.  And I talked to the student.  I talked to him about his challenges with addiction.  He had a -- we were talking outside after class.  He had a breathalyzer in his car. So he -- his car wasn't with him at class.  And during one of our class weekends, which usually run Friday, Saturday, and Sunday, the student was missing on Saturday.  And they found him, if I recall, late Saturday night passed away in a hotel room in Durham.

That was -- that was really hard for me.  And it reminded me of how a 16-year-old niece had died the -- the year before because of a -- an overdose of Tylenol.



Case 1:24-cv-00805-CCE-JGM     Document 50-1     Filed 03/16/26     Page 62 of 79

So I think in that particular class, I talked more -- more than usual about personal beliefs and inclusion because I really wanted -- I thought I was helping the class get over this traumatic incident.

In the moment, I can remember thinking, like, that healing from that student's death was more important than -- than the actual class, like, in the -- in the moment. And I still think that -- would I have handled it a different way? Maybe so, but it was -- it was a really a tough time.

Q. You noted a moment ago that it had been -- your incorporation of your personal beliefs into your classes had progressed or had changed over the years. Is that -- I'm not trying to misstate you, but --

A. No, I -- I think that is a fair statement.

Q. Earlier we talked about the incorporation of your discussions about job prospects, complaints about administrators started roughly around 2019.

Do you know when you started incorporating your own personal beliefs more into your lectures?

A. I'm not sure that I would -- one, I -- I don't -- I wouldn't characterize it as incorporating. Well, there's two -- there are two issues. There's incorporating my personal story into my lectures, which was that -- that's not really what was happening here.



800.211.DEPO (3376)
EsquireSolutions.com

But then there is also, you know, like, reading my memoir or using other people's memoirs in class. That -- that was very recent.

But as far as, you know, at the beginning of class, we're talking with students at break or, you know, teaching. I mean, some of it was even not what I was saying, but what I was wearing. So I -- I had a love is love shirt that I wore. I had a jumper with a rainbow stitched on it, jean shorts that I wore. That didn't take away from class time. And as you can read in the recommendations, those kinds of things helped some people feel included.

Q. Okay. And I'm just trying to get a better sense of you noted earlier that it was a progression. And I'm asking when that started, when you started to do those things, incorporating those things more into your classroom, if you remember?

A. Yeah. I would say, you know, if I had -- like, with many things in life, the period and the pandemic was -- and around George Floyd and everything that was happening then was certainly when I started engaging students more on these -- these issues. And -- and often that engagement was in ways that were -- students may have felt that it was about personal beliefs, like the one student who says on -- sorry, just taking me a

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

second to get.

But on 3866, the second paragraph, you read from part of that, I think, if I remember correctly, but the student says, "Even though I, the social liberal, agree with 90 percent of your personal observations about our society today, I think you would be better served not to share everything that you do during class time.  If I wanted a degree in some sort of Native American studies or African American studies, I would not have pursued an MBA."

I -- I think that student was referring to when I started a lecture around Juneteenth with research on the continuing economic impact of slavery on the American economy.  While that was not something that was going to be on the test that I would give at the end of that class, that it wouldn't be on the exam, I thought it was an important idea for the class to understand why there was or there continues to be an economic inequality in our economy.  So that was a very structured and research-driven part of a lecture, very purposeful on my part.  That may have felt like personal feelings to students, even though it was, you know, peer-reviewed research.

Q.   Okay.  I hadn't actually gotten to that one yet because we were going to talk about that one for a



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 65 of 79

AIIS major or minor.

Q. Okay. You make a couple other requests. You also asked to allow another ten to 15 students. You would need a larger class. And then Leticia responds, "Hope you're having an amazing summer. That sounds okay by us. Andi will plan the spring schedule soon, and she'll try to accommodate Business 611 to a 75-seater."

Why did you send this email initially?

A. Like it says, I talked with Anna, as Anna Millar is copied on the email, who was then if I recall her title correctly the director of the undergraduate business program, similar role to what Jordan Hale is now. And yeah. And she thought it was a good idea to incorporate more indigenous topics into that class and try to attract a new set of students to the business school. I think we haven't had a lot of American Indian students as majors.

Q. Okay. And this notes you had begun discussions to have it listed. But it doesn't make a request to change the class description or the syllabus?

A. Yeah. That is correct. As to what I'm seeing, I had not.

Q. But despite that, you did then change the syllabus to have a focus on indigenous issues, correct?

A. Every year, I update the syllabus. I try to update



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

10 to 20 percent of the cases with new cases. In that particular year, I -- I added cases that were cases relevant to indigenous issues. But they still were within the framework of international development.

Q. You also changed the name of the course internally, correct?

A. And "internally," I just mean on the syllabus I gave to students --

Q. Yes.

A. -- it said -- at some point, I did change it to International Development, colon or maybe not colon, Focus on Indigenous Issues.

Q. And I'll represent to you I believe that was in 2019.

A. Yes.

Q. Did you take any other steps other than that email in 2019 to alert or make any changes with FBC to your syllabus or -- excuse me. Strike that.

Changes with Kenan-Flagler to the course description that students received and/or the syllabus that they had?

A. No. I felt at the -- I don't remember taking any other steps. I felt at the time and -- and still feel that the course description as it stood described the course I was teaching even with the new cases focused on



800.211.DEPO (3376)
EsquireSolutions.com

indigenous issues.

For example, you know, a few years before, I had a lot of cases around China and East Asia. I could have called it international development with a focus on East Asian issues. It would still have fallen under the same course description that it -- it -- so it -- it -- they are -- the cases were -- all the cases are from different areas and different locations generally trying to teach certain lessons in international development. And I started using cases that incorporated indigenous businesses, indigenous -- yeah, usually an indigenous-owned business, just -- a -- a -- yeah, a different kind of business and an example of how that fit in the -- the rubric of (inaudible).

Q.   Three years later, I'm looking at the next page, you sent emails with Andi Della Flora, excuse me, first one back in -- Andi actually reached out to you on October 7th, 2022, and I'm looking at UNC 5059, providing you with a description for Business 611. I just want to read it. It says, "Poverty is part of life for most of the world's population with half living on less than $2 a day. Course focuses on understanding this from a business school perspective, looks at an institutional theories that contribute to persistent poverty and the multiple roles managers can play in



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 68 of 79

April 3rd of 2024.

A.    Okay.  Yeah.

Q.    First -- so I'm looking at 23.  And the actual emails you wrote to Dean Frank -- actually strike that.

      Tell me a little bit about what you remember about the meeting with Dean Frank, how it went, what you discussed?

A.    Overall -- overall, I felt the meeting -- I mean, we -- I -- you know, I just iterated some of the list of things we discussed.  But as far as overall, I felt very happy after the meeting and really felt that it was a good meeting and that connected with her and that, you know, maybe there was some hope for -- for change.  Both to my personal situation and that of the school in general.

Q.    Okay.  You then sent her an email on February 17th.  Was that, I guess, that's Saturday.  You met with her on Thursday.  Why did you send her the email?

A.    I felt -- during the discussion, it was really so many things just, like, as -- as we've gone through today, there's so many -- so many events that have occurred in my time or that occurred in my time at Kenan-Flagler, that it can be really hard to articulate in, you know, the overall, sort of, theme or trajectory of events during my time there.  So I -- I was trying to

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

organize my thoughts and better explain to her what I felt I was up against.

Q. Okay. She did not respond to your initial email, immediately respond to your email; is that right?

A. That is correct.

Q. Okay. Going to 2020 -- excuse me, Exhibit 24 over here. What is this document?

A. The intent of the document is to put some context to the chain of emails.

Q. Okay.

A. What I don't recall offhand is -- that this is likely and then I have -- I would have to check -- to verify that, you know, this was -- it could have been a -- a number of things. Either posted on LinkedIn, given to a reporter, and/or given to the provost and -- and -- as part of the review of my course. Provost and other Kenan-Flagler university leaders.

Q. Okay. I looked -- I didn't -- it didn't seem to be connected to the documents you provided the provost. Not to say that's not, I just -- it was hard for me to track it. And that's why I was curious.

A. It could have been an attachment. I -- but I don't -- I could do a -- I think quickly figure out where it fit into everything, but that -- it was written around that time.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Okay.  Is --

A.   After April 22nd.

Q.   After this is over, if you could just ask your attorney.  And if it's something very simple, like, this was attached to the provost, that would be very helpful. I tried very hard to try and figure out and I couldn't do it.

A.   Sure.

Q.   When you read the email -- at a certain point, you read your first email to your Business 611 class, correct?

A.   That's correct.

Q.   Based on document we'll look at, essentially in a moment, I believe it was sometime -- you've said before, sometime in mid-March of 2024; does that sound right?

A.   Yes.

Q.   Did you include the names of the other faculty members, that you put in the initial email, when you read it out loud to your class?

A.   I think that I likely did.  I'm not certain, but I think I may have and it was my impression that these weren't -- these were not professors that they would necessarily know.  And I -- and I -- yeah.  Off the top there, I -- I think that I -- I probably included the names when I read it in class.  I'm not 100 percent sure


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

if I included all of them or if I omitted one or two, but.

Q. You mentioned earlier about how you took great offense when you read a comment about how another professor had spoken about you in one of his classes. And yet, you seem to be doing the same thing here in Business 11 -- 611. So what's the difference?

A. Well, let's look at each of those instances because I don't think they're all quite all the same. Here, I said -- I was the person that's in red on 474. I say, "After, a senior professor told a colleague that the business school hates me." You know, I was passing along a direct quote from someone through a very incredibly reliable source. I didn't -- I wouldn't take issue if somebody quoted me.

Q. And you felt that was appropriate to share with students in your International Development class?

A. In the context of the whole email, sure. I wouldn't have just pulled that quote out of thin air without some context or without some meaning. But I think it is, you know, in the context of the course and talking about economic development barriers to mobility -- economic mobility problems that Native American people, in this case me, might run into at work. It seemed, you know, related to the overall theme



Case 1:24-cv-00805-CCE-JGM    Document 50-1    Filed 03/16/26    Page 72 of 79

of -- yeah. Challenges of -- of -- as we've talked a lot about in the course, of walking into worlds. I talk about Christian Lundblad having wrote that he literally lost sleep over me and my situation. That's no exaggeration, that's in the next paragraph. That's not saying anything bad about Christian. He was trying to help me out and thought I was in a tough situation. I, then, in the next paragraph, I take out a name.

This is what an example of another colleague, Greg Brown, had sent to me. And he gives the opinion that -- that's written there. That wasn't saying anything bad about Greg. He was just giving me his opinion on how people at work felt. And then I give, I think the -- the last place, is Wayne Landsman's name, when he talked about having a colleague, who was nominally Native American. I left his name in there.

Q. Why'd you do that?

A. You know, I was reading the email that -- that I had written to Dean Frank.

Q. Okay. Talk a little bit -- we're probably going to come back to this, but. Mark this is your syllabus for 20 -- Business 611 syllabus for the spring of '24. I might have a couple questions about it, but I just have one for the moment, so. It's -- these are --

THE REPORTER: Counsel, are you marking this


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

opportunity than winding up in some of the same places that you would, if -- if you'd never left home.

So it was, you know, to describe that. But it was -- it wasn't explicit talk of the use of drugs, or anything like that, that I would consider inappropriate. Or -- and I would not consider it disconnected from class content.

Q. Okay. The other notes -- comments that you made in class that you were going to, "Burn this bitch down." What I'm showing you are a post -- two posts. The first being -- I believe, again, this was in May. Because again, as you know, it's the five months.

MR. PADGET: And then the second one was a post that you also did, I believe, in May of 2022. But the first post -- and this is Exhibit 32 referencing that, quote, "Burn this bitch down."

(Defendant's Exhibit 32 was marked for identification.)

BY MR. PADGET:

Q. And my only question here is, I understand -- I've read through the documents. I understand your rationale for saying it. But my question on here is that -- and I'm looking just at the first page, at UNC 4980, it notes that you say, "I'm still amazed." Excuse me. "In hindsight, I'm still amazed that I have uttered those



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

words in class on more than one occasion."

How many times did you say "I'm going to burn this bitch down" to your students and in which classes?

A.    The only time that I recall saying it in -- in the context of using the metaphor to burn something down was in early 2023.  So in the spring semester of 2023 in BUSI 611, I had something -- if I recall correctly, there are two -- two possible scenarios where I -- where I said it.  I think that -- or maybe I said it each of these ways in two different classes.

One was when there was a fairly, I felt, credible word out of the search committee for the new dean that the -- the five candidates had been chosen to visit campus and that they were all white males.  And I told my class that if they are -- if there are five white male dean candidates, I'm going to burn this bitch down.  Which my intention was, you know, using it as a metaphor, as I described here.  I -- I had heard that phrase in a -- in a -- from a speech given by activists, like Kimberly Jones, and it had stuck with me and I even forgot for a time where it -- where it came from.

But, you know, I would send emails and then burn things down, like we've been reading all day about me burning different things down.  And so that was -- would've been more of the same.  I may have said --


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

sorry, can I --

Q. No, go.

A. I may -- I -- I think I also said at some point that I asked for a -- a -- I noticed in the -- in the Kenan Institute for Private Enterprise, sometime in -- in 2018 or so, that there was a painting of Silent Sam in the lobby of the Kenan Institute that was property of the Kenan family. It -- it was a very disturbing painting, because Silent Sam was, like, painted in the middle of campus, but blown up bigger than the old well, bigger than the buildings.

And -- and I probably conveyed this to the students in -- maybe in the same class, maybe in -- in preparation for a GIE class and maybe the one going to Alaska. I don't quite remember. Of -- that I felt like if -- when I let someone know about it, it was -- actually came down pretty quickly in a few days. I let someone know, and they -- they didn't include my name in it, but I said something to students, like, well, if they didn't take that down, I would've had to burn this bitch down.

Q. Okay.

A. Which, again, would -- meant I would've taken a picture of that painting and sent it around in an email, something like that.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Anything else about her EOC interview that is -- that you made note of?

A.   Sorry, I have to collect myself a bit.  I made a fair amount of notes on that.  You know, there -- another point, I think when -- you know, she talked about me reading the emails from Dean Frank, and disparaging her colleagues, and how that felt personal to her.  And as we discussed today, I -- you know, I mentioned a -- a comment anonymously by a professor who -- who said that I kind of went off the rails.  You know, I mentioned how Christian was losing sleep over my situation.  I mentioned an email by Greg Brown where he talked about people personally targeting me.

And then the only name I mentioned in -- which was just quoting what the guy actually said, was Wayne Landsman calling me nominally native and -- and in part, I included his name because I had emailed Wayne, I think early in 2023, and kind of explained why that was a wrong thing to say, and -- and being like, hey, I -- I am -- you know, I think you're a good person, I have a friend who has considered you a mentor, but I wanted to explain this.  And -- and he never responded to that email, so that kind of felt like he was saying it all over again.  Like he -- he just wasn't willing to engage in a conversation about that.



CERTIFICATE OF REPORTER

I, ROCCO FRANCO, a Digital Reporter and Notary Public in and for the State of North Carolina do hereby certify:

That the foregoing witness whose examination is hereinbefore set forth was duly sworn and that said testimony was accurately captured with annotations by me during the proceeding.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am not interested in the outcome of this matter, financial or otherwise.

IN WITNESS THEREOF, I have hereunto set my hand this 9th day of December 2025.

ROCCO FRANCO

North Carolina Licensed Court Reporter No. 202403900042

Notary Commission Expires: February 5, 2029



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CERTIFICATE OF TRANSCRIPTIONIST

I, CARLY ANNE DAVIS, Legal Transcriptionist do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 9th day of December 2025.

*Carly Anne Davis*
_____

CARLY ANNE DAVIS

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com