IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| LARRY CHAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24-CV-805 |
| | ) | |
| THE UNIVERSITY OF NORTH | ) | |
| CAROLINA-CHAPEL HILL and | ) | |
| MARY MARGARET FRANK, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, Chief District Judge.

Dr. Larry Chavis was a non-tenured professor at the University of North Carolina-Chapel Hill Kenan-Flagler Business School. In 2024, UNC declined to renew his teaching contract. He alleges that decision was based on his race, made in retaliation for his reports of discrimination and outspoken criticism of UNC on diversity issues, and violated his First Amendment rights. He has brought claims against UNC and Dr. Mary Margaret Frank, the dean of the business school.

The undisputed material facts establish that the defendants did not renew Dr. Chavis's teaching contract for legitimate reasons, and there is no evidence sufficient to give rise to a plausible inference of discrimination, retaliation, or violation of his First Amendment rights. Therefore, the defendants' motion for summary judgment will be granted.

## I.    Facts

The facts as recited are either undisputed or viewed in the light most favorable to Dr. Chavis, as required at this stage of the proceedings.

Dr. Chavis began working at UNC in 2006 as a tenure-track economics professor. Doc. 50-1 at 25–26.[1]  In 2013, he switched to a non-tenure-track teaching position on a year-to-year basis.  Doc. 50-2 at 2.  UNC renewed his contract each year until 2016, when Dr. Chavis accepted a five-year contract.  *Id.* at 3–9; Doc. 50-1 at 37–38.  In 2017, UNC appointed him as interim director of the university's American Indian Center.  Doc. 50-1 at 8.  He later became the center's permanent director.  *Id.* at 10–11.

During his time at UNC, Dr. Chavis frequently posted on social media about events and topics related to diversity, equity, and inclusion.  *See* Doc. 50-4.  His posts were often highly critical of the approach taken by UNC and the business school to these issues.  *See, e.g.*, *id.* at 1, 5, 9.

He also regularly communicated his concerns to his colleagues and other UNC faculty.  Some of these emails addressed broader institutional or societal situations, while others focused on his personal circumstances at the university.  *See, e.g.*, Doc. 50-7 at 1– 2.  In a 2020 email to the chancellor and the provost, Dr. Chavis expressed his belief that he had been passed over for promotions and his disappointment about a perceived lack of diversity at the business school.  Doc. 50-3 at 1–3; Doc. 53-1 at 8.  He made at least one internal complaint to UNC's "EOC office."  *See* Doc. 53-10 at 5.

---

[1] All page citations are to the pagination appended to exhibits by the CM-ECF system, not to internal pagination within the exhibit.

In early 2021, Dr. Chavis resigned from his position as director of the American Indian Center because he was frustrated with the center's limited funding. Doc. 50-1 at 11; Doc. 50-4 at 5. That fall, Dr. Chavis began a fellowship with the American Council on Education at the University of Denver, after UNC nominated him for the position. Doc. 50-1 at 12–15. Because of his participation in the fellowship and the possibility of other opportunities, Dr. Chavis asked that UNC renew his contract for only two years in 2021. *Id.* at 39.

Dr. Chavis returned to UNC in December 2021. *Id.* at 17. UNC promoted him to full clinical professor at the end of the 2022 spring semester. *Id.* at 41.

During the summer of 2022, Dr. Chavis taught a graduate microeconomics course at UNC. Doc. 50-5 at 1. One student in that class left course feedback stating in part:

> Even though as a social liberal I agree with 90%+ of [Dr. Chavis's] personal observations about our society today – I think you would be better served to not share everything that you do during class. If I had wanted a degree in some sort of Native American studies or African American studies I would not have pursued an MBA. While I was not the least bit offended by your observations, I suspect there were some of the class that were.

*Id.* at 4. When Dr. Chavis learned about the comment, he posted an excerpt of it on LinkedIn and stated that it was "just mean and walks right up to and probably crosses a line into being offensive." Doc. 50-16 at 19. There is no evidence to indicate UNC took any action based on the evaluation or Dr. Chavis's post, and at the end of the 2022-2023 school year, UNC renewed Dr. Chavis's contract for another year. Doc. 50-2 at 17.

In August 2023, Dr. Mary Margaret Frank became the dean of the business school at UNC. Doc. 50-18 at ¶ 3. As part of meeting with faculty and conducting focus

3

groups, Dean Frank met with Dr. Chavis in February 2024 to discuss his thoughts about the business school and his position. *Id*. at ¶ 4; Doc. 50-8 at 1–3. In an email sent shortly after that conversation, Dr. Chavis expressed frustration with his lack of career advancement at UNC and explained that he limited his time and interactions at the business school because of his perception that other faculty members "hate [him] for being too truthful and too supportive of equity." Doc. 50-8 at 2.

When Dean Frank did not respond to the email by early April, Dr. Chavis read it aloud to some of his classes. Doc. 50-1 at 71. In a follow-up email, Dr. Chavis informed Dean Frank that he had read the previous email to his students and that he planned to post about the email on LinkedIn. Doc. 50-8 at 1.

During a separate meeting in February 2024, Associate Dean Dr. Christian Lundblad notified Dr. Chavis that his contract would be renewed for another year. Doc. 53-3 at 2.

That spring, several graduating students told Associate Dean Dr. Shimul Melwani that they had serious concerns about Dr. Chavis's undergraduate international development class. Doc. 50-17 at 6–7. They reported that the course content did not align with its description in the course catalog; that the course was poorly organized and "essentially was a stream of consciousness conversation" about Dr. Chavis's personal issues; and that Dr. Chavis humiliated certain students because of, for example, their race and fraternity affiliation. *Id.* at 7–9. The students who spoke with Dr. Melwani expressed fear that Dr. Chavis would retaliate against them if he knew they had reported their concerns, *Id.* at 6–7, and several students who spoke with Dr. Lundblad reported the

same fear, including that Dr. Chavis would share their course evaluations publicly, as he had done in the past. Doc. 50-14 at 6–7.

Following those complaints, Dr. Lundblad and Associate Dean Dr. Brad Staats decided to record Dr. Chavis's classes, to see if the student complaints were accurate. Doc. 50-13 at 7. After receiving permission from UNC's human resources department and with no objection from Dean Frank, Drs. Lundblad and Staats arranged to record several of Dr. Chavis's class sessions; they did not tell Dr. Chavis in advance that these recordings would occur. *Id.* at 7–8; Doc. 53-4 at 25.

In March 2024, Dean Frank asked Dr. Lundblad to initiate a "Teaching Evaluation" of Dr. Chavis. Doc. 50-13 at 10; Doc. 50-18 at ¶ 7. As part of that process, Dr. Chavis learned about the recordings and protested that they violated UNC policy. Doc. 53-10. He also gave a series of interviews about the recordings with local and online news outlets, Docs. 53-12, 53-13, 53-14, 53-15, and posted on social media about articles covering the incident. Doc. 53-16 at 11–18.

The evaluation process was conducted by "[s]chool leadership." Doc. 50-10 at 2. The evaluators examined the course syllabi, student reports, and recent student written evaluations, and considered in-person faculty observations. *Id.* To facilitate that evaluation, UNC agreed at Dr. Chavis's request to use in-person observations of his classes instead of reviewing the recordings. Doc. 50-13 at 10; Doc. 53-10 at 1–2.

At the end of the teaching evaluation, a written report was prepared. *See* Doc. 50-10 at 2–5. The report is not signed, but it is apparent from reading it and the evidence about it that several people participated in gathering and reviewing the information. In

5

the report, the responsible school leadership made several findings.  First, Dr. Chavis had changed the course's content to focus on indigenous issues without approval and without revising his syllabus, course name, or course catalog description.  *Id.* at 2.  Second, Dr. Chavis had replaced the course content with discussion of his personal and professional situation and his dissatisfaction with some of UNC's decisions, which created an environment that required students to discuss his personal circumstances during class and created a fear of retaliation if he disapproved of a student's contributions.  *Id.* at 2–3.[2] Third, in course evaluations, several students expressed concerns about Dr. Chavis's course content and teaching methods, though the report noted that there were also many positive evaluations.[3]  *Id.* at 3–4.  Finally, during in-person teaching observations, Dr. Chavis "covered content inconsistent with" the course description, including "some limited discussion of his personal situation."  *Id.* at 4–5.

The evaluators concluded that the examination "uncovered several issues regarding content and conduct, including students reporting safety issues and fear of retaliation."  *Id.* at 5.  When UNC sent Dr. Chavis the evaluation in May 2024, he

---

[2] Specifically, the evaluators found that Dr. Chavis used class time to talk about how he was "wronged by the business school" and to "read from his manuscript on his life;" that he "stated that he was going to 'burn this b*tch down'" if a UNC hiring process went a certain way; that he asked students "to comment on his life and personal circumstances" in a way that felt pressuring to students and made them fear he would retaliate by giving a poor participation score, which accounted for 35% of a student's grade; and that he told students not to go to the administration if they had complaints about his class but to come to him directly.  Doc. 50-10 at 2–3.

[3] In his brief, Dr. Chavis states that the report "[l]eft unmentioned . . . a larger number of highly positive observations from students."  Doc. 53 at 9.  That is not an accurate account of the record.  *See* Doc. 50-10 at 3 & n.5 (evaluation stating that "there are a number of positive evaluations from students who appreciate Prof. Chavis'[s] approach and topics.").

disputed many of its findings and posted the evaluation and his response on social media. Doc. 53-16 at 16.

Dean Frank reviewed the teaching evaluation and decided not to renew Dr. Chavis's contract for the coming academic year. Doc. 50-18 at ¶¶ 8–14. On June 10, 2024, Dean Frank informed Dr. Chavis of this decision. Doc. 50-15 at 17.

Additional facts, disputed and undisputed, will be discussed in context as needed.

## II.     Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial. *Id.* at 709–10..

## III.    Title VII Retaliation Claim against UNC and Section 1981 Retaliation Claim against Dean Frank

Title VII and 42 U.S.C. § 1981 prohibit employers from retaliating against employees who engage in certain protected activities, including complaining to

supervisors about suspected violations of those statutes. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). Absent direct evidence of retaliation, such claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173–74 (4th Cir. 2023); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). To state a prima facie case of retaliation, the plaintiff must establish "(1) that he engaged in a protected activity; (2) that his employer took an adverse action against him; and (3) that there was a causal link between the two events." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (cleaned up); *Boyer-Liberto*, 786 F.3d at 281 (explaining that the elements of a prima facie retaliation claim are the same under Title VII and § 1981).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate "a legitimate nonretaliatory reason for its actions." *Lashley*, 66 F.4th at 174 (cleaned up). If the employer does so, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that [the defendant's] purportedly neutral reasons were a pretext for discrimination or retaliation." *Beverly v. Becerra*, No. 20-CV-1724, 2022 WL 636626, at *2 (4th Cir. Mar. 4, 2022) (per curiam) (unpublished); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021). "The ultimate burden to prove retaliation rests with the plaintiff." *Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021).

The causation standards for discrimination claims and retaliation claims are not identical. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). "Retaliation plaintiffs are limited to traditional principles of but-for causation and must be able to prove that the unlawful retaliation would not have occurred in the absence of

8

the alleged wrongful action or actions of the employer." *Id.* (cleaned up); *see also Lashley*, 66 F.4th at 176–77.

Dr. Chavis has presented no direct evidence that Dean Frank did not renew his contract in retaliation for a protected activity, and he does not assert that there is any such direct evidence. *See* Doc. 53 at 12. Nor is there circumstantial evidence sufficient to raise an inference of such retaliation.

Dr. Chavis identifies his protected activity as his interviews with local media outlets and online publications and his postings online in the spring of 2024 criticizing the recording of his classes without his knowledge, which he contends was linked to racial discrimination. *Id.* at 13–14. He points to the temporal proximity of those public complaints to the decision not to renew his contract as supporting an inference of causation. *Id.* at 17 n.5. The defendants dispute both contentions.

Assuming without deciding that Dr. Chavis has made out a prima facie case for retaliation, the defendants have articulated a legitimate, nonretaliatory reason for their actions. All available evidence shows that Dean Frank's decision not to renew Dr. Chavis's contract was based on the findings made during the teaching evaluation of his international development class. In her deposition, Dean Frank, the decisionmaker, testified that the "deciding factor" for not renewing Dr. Chavis's contract was that he "had chosen to teach material that had not gone through the process of being approved, and that [he] was thus teaching content that was not what we were expecting in the program." Doc. 50-15 at 17. She has also testified that concerns about the physical and

9

psychological safety of UNC's students motivated her decision.  Doc. 50-18 at ¶¶ 12–13; *see also* Doc. 50-15 at 18–19.

In sum, her proffered reason for not renewing Dr. Chavis's contract was "the litany of concerns that were discussed in the Teaching Evaluation."  Doc. 50-18 at ¶ 14.  Those concerns constitute a legitimate, nonretaliatory reason for not renewing his contract.

In an effort to rebut this evidence, Dr. Chavis contends that the testimony of Dr. Melwani "casts doubt on that narrative" and that "there is a dearth of record evidence that [Dr.] Chavis'[s] course offering actually ran afoul of approved parameters."  Doc. 53 at 17–18.  But Dr. Chavis himself admits that he did not obtain approval for the changes he made to the syllabus, Doc. 50-1 at 67, and he acknowledges that he "began to shift the content of his academic offerings" in 2023 and 2024.  Doc. 53 at 4.

Moreover, nothing in the testimony identified in Dr. Chavis's brief supports his contentions. [4]  Dr. Melwani stated only that she did not know the procedures for addressing discrepancies between course descriptions and course content and "would probably take [it] up to [her] . . . supervisors," that she thought it would be a context-dependent problem, and that if Dr. Chavis's contract had been renewed that she might have assisted him with aligning his syllabus with his course content.  Doc. 53-6 at 39–40, 44–45.  She was clear that she did not "want [Dr. Chavis's] course in its current state being taught in the program because it has not been approved."  *Id.* at 41.  That is a far

---

[4] Even if the evidence showed that Dr. Chavis's co-workers did disagree with Dean Frank's decision, that would not give rise to an inference of retaliation.  *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (noting that the alleged opinions of a plaintiff's co-workers as to the quality of the plaintiff's work are "close to irrelevant" (cleaned up)).

cry from saying Dr. Frank did not follow procedure or from disagreeing with the decision not to renew Dr. Chavis's contract, and it is unrelated to any asserted protected conduct.

Dr. Lundblad, whose deposition Dr. Chavis also cites, Doc. 53 at 18, testified that his understanding from Dr. Melwani was that some assigned readings did not align with Dr. Chavis's syllabus, but since Dr. Melwani was responsible for reviewing the course content, he could not say whether there were other discrepancies. Doc. 53-3 at 9–11. That too does not support Dr. Chavis's contention.

Dr. Chavis also asserts that UNC did not follow its internal procedures when it recorded his classes and that this shows pretext. Doc. 53 at 20. But his brief points to no evidence that internal procedures were not followed. *See Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 395–96 (4th Cir. 1994) (noting that the district court was "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate"); *Hughes v. B/E Aerospace, Inc.*, No. 12-CV-717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

Finally, he contends that in the teaching evaluation Dr. Lundblad gave too much weight to the minority of negative student reviews of Dr. Chavis and that this shows he "manufacture[d] grounds for nonrenewal." Doc. 53 at 20. But the mere fact that Dr. Chavis disagrees with the teaching evaluation is not enough to show that the reliance on the evaluation was pretextual. As the Fourth Circuit has repeatedly held, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 248 (4th Cir. 2020) (cleaned up); *see,*

11

*e.g.*, *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 794 (4th Cir. 2023); *Hawkins*, 203 F.3d at 280; *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998); *see also Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (noting in the FMLA context that "it is not the courts' place to determine whether the decisionmaker's assessment of the plaintiff's performance issues was wise, fair, or even correct, so long as it truly was the reason" for the decision (cleaned up)).

There is no evidence that anyone involved in the evaluation or the decision not to renew Dr. Chavis's contract fabricated the student-initiated reports about Dr. Chavis's course or falsified the student evaluations, and there is no other evidence to suggest the teaching evaluation was "manufactured" as a pretext. *See Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257 (4th Cir. 2025) (noting that evidence of falsity can show pretext). Nor is there evidence that UNC or Dr. Frank have changed their explanations over time for why Dr. Chavis's contract was not renewed. *See id.* at 258 (noting that shifting reasons for firing an employee can demonstrate pretext).

District courts do "not sit as a kind of super-personnel department weighing the prudence of employment decisions." *DeJarnette*, 133 F.3d at 299 (cleaned up). Multiple students reported that Dr. Chavis was using class time on subjects well outside the syllabus, and classroom observations by other faculty substantiated those reports. Several students credibly reported that his teaching methods caused some students to fear embarrassment and retaliation based on required class participation. An internal evaluation supported the conclusion that Dr. Chavis did not follow UNC's procedure for

12

changing his course content.  Those are valid reasons for not renewing a professor's contract.

Courts must "resist the temptation to become so entwined in the intricacies of the *McDonnell Douglas* proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination."  *Wannamaker-Amos*, 126 F.4th at 255 (cleaned up).  Here, Dr. Chavis's evidence of retaliation amounts only to speculation.

Dean Frank's nonretaliatory explanation for her decision not to renew his contract is well supported by the evidence and is far from being "so flimsy as to be *untrue* or *implausible*."  *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 728 n.4 (4th Cir. 2019); *see also Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) ("minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it" are insufficient to show pretext).  Nor is there evidence that the explanation is "unworthy of credence" or otherwise suggestive of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  Dr. Chavis had been publicly speaking out on diversity, equity, and inclusion issues for years without negative employment actions, and indeed he had been made director of UNC's American Indian Center in 2017, recommended for a fellowship in 2021, and promoted to full clinical professor in 2022, all despite his public unhappiness with the business school's administration.

There is no direct evidence of retaliation, and, viewing the facts in the light most favorable to Dr. Chavis, there is no evidence to support a reasonable inference of that

13

Dean Frank decided not to renew his contract because of his public statements about the school's lack of diversity and challenges with inclusion.  The defendants' motion for summary judgment will be granted as to the Title VII and § 1981 retaliation claims.

## IV.    Title VII Discrimination Claim against UNC

Title VII also "prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 305 (2025); 42 U.S.C. § 2000e-2(a).  Employment decisions motivated by both legitimate and illegitimate reasons, or "mixed-motive" decisions, are actionable under Title VII.  *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005).  A plaintiff succeeds on a mixed-motive claim if he "demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  § 2000e–2(m).

As with retaliation claims, discrimination claims can be proven by direct or circumstantial evidence.  *See Duvall v. Novant Health, Inc.*, 95 F.4th 778, 788 (4th Cir. 2024).  Dr. Chavis has produced no direct evidence of discrimination and acknowledges that "there is nothing that suggests any of the leadership team that influenced or directed the non-renewal decision-Frank, Lundblad, or Melwani-harbored racial biases of their own."  Doc. 53 at 21.

He also has not produced circumstantial evidence that racial discrimination played a role in the decision not to renew his contract.  As discussed *supra*, all of the evidence shows that Dean Frank decided not to renew Dr. Chavis's contract based on the findings in the teaching evaluation.  In the absence of direct or circumstantial evidence that any

14

decisionmaker possessed a discriminatory attitude that affected the decision, even a mixed-motive claim cannot prevail. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (explaining that, under the mixed-motive framework, a plaintiff "must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision." (cleaned up)).

Dr. Chavis contends that there is evidence that race played a part in Dean Frank's decision. He asserts that racial animus motivated the negative student feedback Dr. Chavis received, that Dean Frank relied at least in part on that feedback when she decided to end Dr. Chavis's employment, and as a result Dean Frank's decision was infected with racial animus. There are at least two problems with that contention. First, the students who complained about Dr. Chavis's course were not decisionmakers. *See id.* at 287–88. Second, there is no evidence to support an inference that Dr. Chavis's race motivated the negative student feedback. The comments provided in the evaluation report reflect the same concerns expressed by Dean Frank: that Dr. Chavis's course content did not match the course description, that he went off on unrelated tangents, and that his classroom behavior and previous posts about a student who gave his course a poor evaluation made some students fear that Dr. Chavis might humiliate them or give them a bad grade if they did not express agreement with his beliefs. *Compare* Doc. 50-10 at 3–4, *with* Doc. 50-15 at 17–18. As Dr. Chavis concedes, those concerns do not suggest racial bias. *See* Doc. 53 at 21.

Dr. Chavis further contends that he received harsher treatment than a similarly situated white professor. But the evidentiary purpose of a comparator is to support an inference of discriminatory motive on the part of a decisionmaker. *See generally Laing*, 703 F.3d at 719. Dr. Chavis has agreed that "there is nothing that suggests any of the leadership team . . . harbored racial biases of their own." Doc. 53 at 21. Even assuming that the other professor is similarly situated to Dr. Chavis, any comparator evidence lacks probative value when all parties agree that the decisionmakers lacked a racial animus.[5]

UNC's motion for summary judgment will be granted as to this claim.

## V. First Amendment Retaliation Claim Against Dean Frank

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. V. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). The elements of a First Amendment retaliation claim are that: "(1) the plaintiff engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected the plaintiff's First Amendment rights, and (3) there was a causal relationship between the plaintiff's protected activity and the defendants' conduct." *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017) (cleaned up).

Here, the causation element is dispositive. That element "asks whether the considerations which animated the defendant's conduct were permissible or

---

[5] Dr. Chavis also reiterates his nitpicks with UNC's teaching evaluation and Dean Frank's proffered reason for not renewing his contract. Those contentions remain unavailing. *See supra* at 10–14.

impermissible." *Martin v. Duffy*, 977 F.3d 294, 300 (4th Cir. 2020).  All of the evidence shows that Dean Frank did not renew Dr. Chavis's contract because she concluded that he had made unauthorized changes to his course content and that his classroom behavior caused students to fear embarrassment and retaliation.  *Supra* at 9–10.

Dr. Chavis contends that the decisions to renew his contract for shorter terms over the course of his employment suggest possible retaliation.  Doc. 53 at 26.  But that contention falls short on two grounds.  First, Dean Frank, the only defendant accused of violating his First Amendment rights, Doc. 23 at ¶¶ 86–90, did not become dean until August 2023, Doc. 50-18 at ¶ 3, well after the earlier contract decisions were made.  There is no evidence Dean Frank played any role in those decisions.  And second, the undisputed evidence is that Dr. Chavis requested a shorter contract in 2021 because of his upcoming fellowship, Doc. 50-1 at 39–40, and that upon his return to UNC he was promoted to full clinical professor.  *Id.* at 40–41.  No inference of retaliation can be drawn from that course of events.

Dr. Chavis also points to the close proximity between April 3, 2024, when he told Dean Frank that he planned to post on LinkedIn about his frustrations with UNC, and April 8, 2024, when the recording of his classes began.  Doc. 53 at 26; *see* Doc. 50-8 at 1; Doc. 53-11 at 1.  But Dr. Chavis's claim is that Dean Frank retaliated against him by not renewing his contract, not by secretly recording his classes.  Doc. 23 at ¶¶ 86–90.  Moreover, there is no evidence that Dean Frank requested that Dr. Chavis's classes be recorded; to the contrary, it is undisputed that Dr. Lundblad and Dr. Staats sought to record the classes on their own initiative.  Doc. 50-13 at 7–8; Doc. 53-4 at 24–25.

17

Finally, Dr. Chavis cites statements made by Dean Frank after the fact that making personnel decisions in a world full of social media posts is "hard" and "difficult." Doc. 53 at 19 (citing Doc. 53-4 at 35). Nothing about those statements shows that Dean Frank did not renew his contract to retaliate because of his social media posts. They merely state the obvious.

There is no evidence from which a reasonable jury could infer that Dean Frank's decision to not renew Dr. Chavis's contract was motivated by retaliatory intent. Dean Frank's motion for summary judgment on the First Amendment claim will be granted.

## VI. Conclusion

Dr. Chavis's claims all run into the same insurmountable hurdle: the evidence is undisputed that UNC and Dean Frank chose not renew his contract because of the teaching evaluation findings, and there is insufficient evidence to support an inference that racial discrimination or retaliation for his public statements caused or played a role in the decision. Thus, no reasonable jury could find that the defendants' actions were the result of retaliatory or discriminatory intent, in whole or in part. The defendants' motion for summary judgment will be granted.

It is **ORDERED** that the defendants' motion for summary judgment, Doc. 47, is **GRANTED**. Judgment will be entered separately as time permits.

This the 30th day of June, 2026.

_____

UNITED STATES DISTRICT JUDGE
